**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ALTON BENN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:11CR127-2 |
| | ) | 1:15CV760 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for recommended rulings on Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("Section 2255 Motion") (Docket Entry 254),[1] Amended Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("Amended Section 2255 Motion") (Docket Entry 258), and Motion for Leave to File Supplemental Pleading ("Supplement Motion") (Docket Entry 310). For the reasons that follow, the Court should deny each of these motions.

INTRODUCTION

On July 5, 2012, this Court (per now-Chief United States District Judge Thomas D. Schroeder) entered a Judgment against Petitioner imposing a prison term of 440 months (see Docket Entry

---

[1] Parenthetical citations refer to Petitioner's above-captioned criminal case.

141 at 2), after a jury verdict finding him guilty of conspiracy to distribute 280 grams or more of cocaine base and five kilograms or more of cocaine hydrochloride in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (see Docket Entry 109 at 2, 4-5). Petitioner appealed, but the United States Court of Appeals for the Fourth Circuit affirmed. See United States v. Benn, 572 F. App'x 167 (4th Cir. 2014).[2] He thereafter timely filed the Section 2255 Motion (Docket Entry 254), raising these seven claims:

1) "Ineffective Assistance of Counsel for Failing to Properly Explain the Terms and Conditions of Plea Agreement" (id., ¶ 12(Ground One));[3]

2) "Ineffective Assistance of Counsel for Failing to File Pre[-]Trial Objections and Defenses to a Defect in Instituting the Prosecution" (id., ¶ 12(Ground Two));

3) "Ineffective Assistance of Counsel for Failing to Object to Dismissal of a Complaint by the Government [in] Violation of Fed. R. Crim. P. 48(a)" (id., ¶ 12(Ground Three));

4) "Ineffective Assistance of Counsel for Failing to Contest the Permittance [sic] of Testimony by Government Witness Testifying to Allegedly Destroy [sic] Video Footage" (id., ¶ 12(Ground Four));

---

[2] Petitioner did not seek review by the United States Supreme Court. (See Docket Entry 254, ¶ 9(g); Docket Entry 258, ¶ 9(g).)

[3] Unless otherwise noted, this Recommendation applies a "first-letter" capitalization convention in quoting the Section 2255 Motion's (inconsistently capitalized) claim labels.

5) "Ineffective Assistance of Counsel for Failing to Inform [sic], Explain, or Discuss Trial Strategy with Petitioner before and during Trial" (id., ¶ 12(Ground Five));

6) "Ineffective Assistance of Counsel for Failing to Impeach Key Government Witnesses with Other Available Evidence that Demonstrate [sic] [They] Had Lied" (id., ¶ 12(Ground Six)); and

7) "Ineffective Assistance of Counsel for Failing to Inform the Court that [Trial Counsel] Was on Medication and It Was Affecting [His] Skills as an Attorney" (id., ¶ 12(Ground Seven)).

The Section 2255 Motion includes some information to support each of those claims and states that Petitioner will submit a subsequent "Memorandum of Law." (See id., ¶ 12(Ground One) - (Ground Seven).) A short time later, he filed:

1) the Amended Section 2255 Motion (Docket Entry 258), which simply re-states the seven claims set forth in the Section 2255 Motion (in near-verbatim fashion as to Grounds One through Three and with minor modifications as to Grounds Four through Seven) (compare Docket Entry 254, ¶ 12 (Ground One) - (Ground Seven), with Docket Entry 258, ¶ 12 (Ground One) - (Ground Seven));

2) a Memorandum of Law, which elaborates on these seven claims (see Docket Entry 259 at 5-55);[4] and

---

[4] Pin citations to the Memorandum of Law refer to the numbers in the footer appended thereto upon docketing in the CM/ECF system (not the handwritten numbers that begin on the second page).
(continued...)

3) Exhibits A through M, which consist of affidavits from Petitioner and two family members, as well as law enforcement and court documents (see Docket Entry 259-1 at 1 (identifying each)).

The United States responded in opposition (see Docket Entry 306)[5] and Petitioner replied (see Docket Entry 319).[6] Petitioner also filed the Supplement Motion (Docket Entry 310), seeking leave to add an eighth claim, described in the accompanying Notice as "Ineffective Assistance of Counsel at Sentencing" (Docket Entry 311 at 2). The United States opposed the Supplement Motion on grounds of untimeliness and lack of merit. (See Docket Entry 377 at 4-8.)

---

[4](...continued)
Petitioner signed his Memorandum of Law without taking an oath (or acknowledging perjury penalties) (see Docket Entry 259 at 55) and thus any factual assertions therein do not constitute competent evidence in this collateral action, see, e.g., United States v. Rhodes, No. 3:08CR82, 2013 WL 150335, at *3 (E.D. Va. Jan. 14, 2013) (unpublished) ("[U]nsworn allegations cannot constitute a basis for habeas relief. . . . Facts alluded to in an unsworn memorandum will not suffice."), aff'd in part and appeal dismissed in part, 531 F. App'x 279 (4th Cir. 2013).

[5] As the Response notes, "[t]ypically in the government's response to a § 2255 motion alleging ineffective assistance of counsel, an affidavit of [the] petitioner's counsel would be attached. In this matter, [Petitioner's trial counsel] passed away on August 6, 2014, . . . and therefore his affidavit [wa]s not available." (Docket Entry 306 at 7.)

[6] Petitioner did not swear to or verify his Reply (see Docket Entry 319 at 12), such that its factual assertions lack evidentiary value, see, e.g., Wright v. United States, Nos. 3:04CR3, 3:10CV174, 2011 WL 4852470, at *17 n.7 (S.D. Ohio May 20, 2011) (unpublished) ("[T]he unsworn allegations of [the petitioner's] reply are not an acceptable form of evidence . . . ."), recommendation adopted, 2011 WL 4852495 (S.D. Ohio Oct. 13, 2011) (unpublished).

The Court (per the undersigned Magistrate Judge) set an evidentiary hearing and conditionally appointed counsel (pending review of updated affidavit).  (<u>See</u> Text Order dated June 26, 2018; <u>see also</u> Docket Entry 355 (designating counsel); Text Order dated July 25, 2018 (granting Petitioner's Motion to Continue Evidentiary Hearing (Docket Entry 357)); Docket Entry 363 (confirming appointment of counsel based on Financial Affidavit (Docket Entry 362)); Oral Order dated Aug. 31, 2018 (granting Petitioner's Motion to Continue Evidentiary Hearing (Docket Entry 361)).)  After taking evidence (<u>see</u> Docket Entries 376, 378, 379), the Court (per the undersigned Magistrate Judge) deferred oral argument pending preparation of transcripts (as Petitioner requested) (<u>see</u> Docket Entry 376; Text Order dated Dec. 21, 2018; <u>see also</u> Text Order dated Jan. 3, 2019 (granting Petitioner's Motion to Continue (Docket Entry 380))).  The parties subsequently addressed all outstanding evidentiary matters via Stipulation (Docket Entry 382; <u>see also</u> Docket Entry 383 at 2 (confirming that Stipulation "resolve[d] any need for . . . issuance of subpoenas") and their counsel presented oral argument (<u>see</u> Docket Entry 383 at 3-31).[7]

_____

[7] Shortly after the completion of the oral argument transcript, the Court (per the undersigned Magistrate Judge) relieved Petitioner's appointed counsel of further responsibility and permitted Petitioner to resume pro se litigation of this collateral action.  (<u>See</u> Text Order dated Apr. 29, 2019 (granting in part Petitioner's pro se Letter Motion (Docket Entry 384)).)

Petitioner possessed a federal constitutional right to effective assistance of counsel in his federal criminal case. See U.S. Const. amend. VI; McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). To make out an ineffective assistance claim, Petitioner must prove that his counsel's performance fell below a reasonable standard for defense attorneys and that prejudice resulted. See Strickland v. Washington, 466 U.S. 668, 687-94 (1984). "Surmounting Strickland's high bar is never an easy task. . . . [T]he standard for judging counsel's representation is a most deferential one." Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal quotation marks omitted); see also United States v. Galloway, 749 F.3d 238, 241 (4th Cir. 2014) ("To meet th[e prejudice] element of an ineffective assistance claim, [the defendant] would have to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different and that the result of the proceeding was fundamentally unfair or unreliable." (internal quotation marks omitted)).

Ground One:  Ineffective Assistance as to Plea Agreement

Ground One of the Section 2255 Motion asserts that Petitioner's trial counsel rendered ineffective assistance by "failing to properly explain the terms and conditions of [a] plea agreement." (Docket Entry 254, ¶ 12(Ground One) (standard

capitalization applied); <u>accord</u> Docket Entry 258, ¶ 12(Ground One).)  As its "[s]upporting facts," Ground One recites:

> In this case the government offered [] Petitioner a plea
> agreement.  I[n] said agreement the government offer
> [sic] to use only one of [] Petitioner's priors for [21
> U.S.C.] §851.  This was if he agreed to the plea
> agreement.  Petitioner's attorney informed him that the
> government did have the authority to use only one prior
> if [the government] w[as] aware of other priors and had
> to use them all.  Counsel further stated that being that
> [Petitioner] had two priors he would receive a **mandatory**
> life sentence if he accepted the plea.  This explanation
> caused [] Petitioner to reject the plea and proceed to
> trial.  Without this erroneous explanation, Petitioner
> contends that he would have accepted the offered plea.

(Docket Entry 254, ¶ 12(Ground One)(a) (emphasis in original).)[8]

The Court should deny relief on this claim.

---

[8] From the surrounding context, it appears that, in the fourth sentence above, Petitioner meant to allege that his trial counsel reported "that the government did [<u>not</u>] have the authority to use only one prior if [the government] w[as] aware of other[s]" (Docket Entry 254, ¶ 12(Ground One)(a) (emphasis added)).  (<u>See, e.g.</u>, <u>id.</u> (alleging that, according to Petitioner's trial counsel, the United States "had to use them all," i.e., had to include all qualifying prior convictions in Section 851 notice); <u>see also</u> Docket Entry 259 at 6 ("[I]n the month of June or July of 2011 [Petitioner's trial counsel] came and saw [] Petitioner . . . .  [Trial] counsel presented to [] Petitioner a plea agreement that was offered by the government. . . .  [Trial c]ounsel improperly explained . . . that the government could not choose specifically what priors to use in regard to a [Section] 851 enhancement.  He erroneously explained . . . that the government was mandated to file ALL eligible priors in a [Section] 851 notice once such priors became known to the government." (emphasis in original)); Docket Entry 259-1 at 3 (declaring under penalty of perjury that trial counsel told Petitioner "that the government could not simply ignore [his] other prior and if [the government] filed a [Section] 851 [notice] on one then [the government] had to include the other prior").)

"A conspiracy involving . . . [280 grams or more of cocaine base or five kilograms or more of cocaine hydrochloride] normally carries a mandatory minimum sentence of 10 years. However, if the defendant [commits such offense] after a prior conviction for a felony drug offense has become final, and the government provides the defendant with the required notice, the mandatory minimum sentence increases to 20 years." United States v. Washington, 574 F. App'x 262, 263 (4th Cir. 2014) (internal citations, emphasis, and quotation marks omitted) (citing Sections 841(b)(1)(A) and 851(a)). "The statutory mandatory minimum is raised to life imprisonment if the defendant sustains the conviction after two convictions for felony drug offenses have become final. In order to enhance the defendant's sentence based on his prior convictions, however, the Government must file an information pursuant to [Section] 851 'stating in writing the previous convictions to be relied upon.'" United States v. Coppedge, 454 F. App'x 202, 205 (4th Cir. 2011) (quoting Section 851(a)(1)); see also United States v. Clarke, 237 F. App'x 831, 833 (4th Cir. 2007) ("When the government seeks an enhanced sentence under [Section] 841, it must file an information pursuant to . . . [Section] 851 . . . stating the prior convictions it will rely on . . . .").

Accordingly, pursuant to Section 851, the United States may choose the prior convictions (if any) upon which it will rely and thereby may "determine whether a particular defendant will be

subject to the enhanced statutory maximum[s of Section 841(b)(1)] . . . ." United States v. LaBonte, 520 U.S. 751, 762 (1997); see also id. (describing "such discretion [(A) as] similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect," (B) as "an integral feature of the criminal justice system, and [(C) a]s appropriate, so long as it is not based upon improper factors"); United States v. Forney, 442 F. App'x 27, 29 (4th Cir. 2011) (acknowledging authority of United States to withdraw "one of the two notices of [the defendant's] prior felony drug convictions," even absent claim "that either of the previous convictions [was] invalid"); United States v. Bennett, No. 2:11CR191, 2012 WL 5512280, at *2 (M.D. Ala. Nov. 14, 2012) (unpublished) ("[A] defendant sentenced for trafficking certain drugs (including crack) is subject to escalating mandatory-minimum sentences . . . depending on his criminal history and the quantity of drugs for which he is held responsible. . . . [T]he law affords prosecutors the discretion to decide the extent to which that criminal history will be placed before the court. Therefore, in the case of a defendant with several prior convictions, the government is essentially granted sole discretion of choosing whether a mandatory-minimum sentence of as high as life . . . is to apply." (internal citation omitted)).

Consistent with the foregoing authority, the record reflects that (in late July 2011) the United States did make a plea offer to

Petitioner, which (A) included an "agree[ment] not to file an enhancement pursuant to [Section] 851, related to [a second] prior conviction" (Docket Entry 306-4 at 2; see also id. at 9 ("The United States . . . agrees not to file an Information of Prior Conviction regarding [Petitioner's] February 21, 1995 conviction for possession of crack cocaine. The United States will file an Information of Prior Conviction . . . regarding [his] October 12, 1999 conviction of possession of a control[led] dangerous substance with intent to distribute, second degree."), and which (B) documented that (as a result of the agreement to give notice of only one prior conviction under Section 851) Petitioner would receive "a term of imprisonment of not less than twenty years and not more than life" (id. at 7-8). However, the record contains no credible evidence to support the bald accusation in Ground One that Petitioner's trial counsel misinformed Petitioner about the discretion of the United States to limit the number of prior convictions in a notice under Section 851 and/or the sentencing exposure Petitioner faced under the plea agreement offered to him. Conversely, many reasons exist to conclude just the opposite.

First, the provisions for filing information(s) of prior conviction(s) codified in Section 851 came into effect in 1970, see Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. 91-513, Title II, Pt. D, § 411, 84 Stat. 1269-70, and Congress revised Section 841 to include mandatory minimums of imprisonment

10

for 20 years and life based on the filing of Section 851 notices in 1986, see Anti-Drug Abuse Act of 1986, Pub. L. 99-570, Title I, § 1002, 100 Stat. 3207-2. Petitioner's trial counsel, in turn, began representing criminal defendants no later than 1974, see, e.g., State v. Best, 23 N.C. App. 507, 509, 209 S.E.2d 364, 365 (1974) (listing Petitioner's trial counsel as attorney for "defendant appellant"), appeal dismissed, 286 N.C. 416, 211 S.E.2d 797 (1975), and, in the quarter-century from 1986 to his handling of Petitioner's case in 2011, regularly represented defendants charged with serious federal drug crimes, see, e.g., United States v. Bailey, 434 F. App'x 195, 196 (4th Cir. 2011) (identifying Petitioner's trial counsel as attorney "for Appellant" who "pled guilty to possession with intent to distribute cocaine base"); United States v. Robinson, 227 F. App'x 289, 289 (4th Cir. 2007) (same); United States v. Marshal, 39 F. App'x 903, 903 (4th Cir. 2002) (same); United States v. Sang, No. 95-5622, 89 F.3d 831 (table), 1996 WL 316479 (4th Cir. June 12, 1996) (unpublished) (same); United States v. Mills, 995 F.2d 480, 482 (4th Cir. 1993) (naming Petitioner's counsel as attorney for defendant convicted of "conspiracy to distribute multiple kilograms of cocaine"); United States v. Dorta, 783 F.2d 1179, 1180 & n.1 (4th Cir. 1986) (same).

During that time, Petitioner's trial counsel negotiated at least one plea agreement in which the United States "agree[d] to withdraw" one of two prior convictions as to which it had given

notice under Section 851, see Plea Agt. at 5, United States v.
Williams, No. 1:08CR223, Docket Entry 23 (M.D.N.C. Oct. 9, 2008),
thereby reducing his client's mandatory minimum prison term under
Section 841(b)(1)(A) from life to "not [] less than twenty years,"
id. at 2. Considering such (recent) past work on a plea agreement
just like the one at issue here and his vast experience with
federal drug cases, Petitioner's trial counsel undoubtedly knew how
Section 851 operated and thus would not have (out of ignorance)
misadvised Petitioner about its functioning or impact on the
statutory prison term that would apply under the proposed deal.

Nor could the Court reasonably conclude that Petitioner's
trial counsel purposely gave false information to Petitioner about
such matters. According to the credible, evidentiary hearing
testimony of Thomas Johnson, an attorney who has practiced law
"[s]ince 1989 in this [C]ourt" (Docket Entry 378 at 6), who
defended one of Petitioner's co-defendants at their joint trial
(see id. at 7), and who "had a chance to see [Petitioner's trial
counsel] practice over the years" (id. at 10), Petitioner's trial
counsel "represent[ed] his clients zealously" (id.) and "had an
excellent reputation in the defense bar" (id. at 17). Petitioner's
trial counsel neither became known for zealously representing his
clients nor earned an excellent reputation in the defense bar by
lying to defendants about the functioning of criminal statutes
and/or the mandatory sentencing implications of plea agreements.

12

Other credible testimony from the evidentiary hearing also bolsters the conclusion that Petitioner's trial counsel did <u>not</u> (negligently or intentionally) mislead Petitioner about the plea offer. In particular, Amy Crowder, the paralegal who worked closely with Petitioner's trial counsel for more than 15 years (<u>see</u> <u>id.</u> at 32), credibly testified that she "overheard calls" between Petitioner and his trial counsel (<u>id.</u> at 51), during which:

1) Petitioner's trial counsel "went over th[e plea agreement] quite a few times" (<u>id.</u>);

2) Petitioner's trial counsel "relay[ed] to [Petitioner]" that the "penalty . . . [he] was facing . . . [f]or the plea agreement [was a] minimum 20 [years], maximum life" (<u>id.</u> at 52); and

3) Petitioner's trial counsel never told Petitioner that, under the plea agreement, "he was facing a mandatory life [sentence]" (<u>id.</u>; <u>accord</u> <u>id.</u> at 59).

Contrastingly, Petitioner's testimony about the plea agreement lacked credibility. As an initial matter, unlike Attorney Johnson and Paralegal Crowder, whose "testimony on the material factual issues [was] credible," including because it "was matter-of-fact, not adversarial, in tone," <u>Diaz v. United States</u>, Nos. 7:09CR100D, 7:11CV43D, 2014 WL 7384974, at *5 (E.D.N.C. Dec. 29, 2014) (unpublished), and because of the absence of any "evidence that [they] had any incentive to lie," <u>United States v. Solomon</u>, 24 F. App'x 148, 151 n.1 (4th Cir. 2001), Petitioner "ha[d] an obvious

incentive to misstate the truth," Cruz-Rea v. United States, No. 3:11CV166, 2015 WL 5785744, at *2 (S.D. Ind. Sept. 30, 2015) (unpublished), as this action "represents perhaps the only remaining avenue open to [him] to potentially escape service of [his] extended prison term," Diaz, 2014 WL 7384974, at *8. Additionally, the credibility of Petitioner's testimony about the plea agreement "[wa]s severely, if not completely, eroded by the fact that [it] stands in direct conflict with [sworn] factual allegations in his [Section 2255 Motion]," id. at *7.

Specifically, the Section 2255 Motion – the contents of which Petitioner verified "under penalty of perjury" (Docket Entry 254, Decl. ¶) – states that, "[w]ithout th[e] erroneous explanation [from his trial counsel about the ability of the United States to limit the convictions noticed under Section 851 and thus the mandatory prison term he faced under Section 841(b)(1)(A)], . . . he would have accepted the offered plea." (Id., ¶ 12(Ground One)(a).) In contrast, at the evidentiary hearing, Petitioner testified that he would not (and indeed could not) have accepted the proposed plea agreement – which obligated him to "enter a voluntary plea of guilty to Count One of the Indictment" (Docket Entry 306-4 at 7; see also id. at 9 (requiring Petitioner to admit that "he is, in fact, guilty" of "Count One of the Indictment")), which (then) charged him with participating in a conspiracy from May 2007 through May 2011, with "Sean Darnell Jeffries, . . .

Robert Eugene Poole, and divers other persons, . . . [t]o knowingly, intentionally and unlawfully distribute 280 grams or more of . . . cocaine base ('crack')" (Docket Entry 10 at 1 (all-caps font omitted));[9] rather, Petitioner swore that:

1) he did "[n]ot [participate in] Sean Jeffries'[s] conspiracy" (Docket Entry 378 at 160);

2) he did "[n]ot [participate in Robert Poole's] conspiracy" (id.);

3) he only "conspire[d] with . . . Pedro and Lammel . . . [who] were in the Gwinnett County area[ of] Georgia" (id. at 162);

4) he "was guilty of something, but not what [he] was accused of" (id. at 163; see also id. ("I was guilty of something . . . which I wasn't charged for . . . ."));

5) "the only thing [he] w[as] going to plead guilty to [wa]s something [he] had not been charged with at the point in time of the . . . potential plea" (id. at 164);

6) he would not have signed the proposed plea agreement as written, but instead "would have written exactly what [he] was guilty of on it" (id. at 167); and

---

[9] The grand jury subsequently amended Count One to charge other participants in the conspiracy, to extend the time period of the conspiracy back to June 2006, and to add distribution of five kilograms or more of cocaine hydrochloride as a second object of the conspiracy. (See Docket Entry 43 at 1-2.)

7) he was "guilty of . . . [t]rafficking . . . [c]ocaine," but not "[c]rack" (id. at 167-68).

At other points in the evidentiary hearing, Petitioner tried to salvage Ground One by contradicting his above-quoted averments and insisting (in conclusory fashion) that (despite his denial of guilt as to the crack cocaine conspiracy charge against him), "if [his trial counsel] would have explained to [him] correctly the terms of the [proposed plea] agreement, [he] would have accepted it." (Id. at 165; accord id. at 166.) However, Petitioner gave still other testimony inconsistent not only with his guilt as to the charged crack cocaine conspiracy, but also with his sworn admission to participating in some other drug conspiracy and/or to trafficking in some other form of cocaine. (See id. at 161 ("I wasn't a drug dealer.").) Finally, when questioned about these matters, Petitioner often responded evasively. (See, e.g., id. at 161-63 ("Q. Well, then who did you conspire with and what did you conspire to do? . . . A. Those people weren't in the courtroom nor were [they] on the indictment. Q. Who are they? A. Those people weren't in the courtroom or wasn't [sic] on the indictment. The Court: The question is: Who did you conspire with? [Petitioner]: Others. The Court: Who? [Petitioner]: They wasn't [sic] charged. . . . Q. So where did you take the[ drugs]? A. I took them out of North Carolina. Q. Where did you take them? A. I took them out of North Carolina. Q. . . . [W]here

out of North Carolina did you take them?  A.  They wasn't [sic] in Greensboro, North Carolina." (emphasis omitted)).)  Eventually, Petitioner's subterfuge necessitated the issuance of an "instruct[ion to him] to answer the question[s] or . . . to [have] stri[c]ke[n] all of [his] testimony."  (Id. at 163.)

Put charitably, "the testimony of [Petitioner] lacked the earmarks of credibility . . . as [it] was both evasive and internally inconsistent. . . .  [From o]bserv[ing his] demeanor . . .[,] it was apparent . . . that h[is] responses were . . . contrived."  United States v. Ponce-Duarte, No. 3:11CR97, 2011 WL 2791244, at *1 (W.D.N.C. July 14, 2011) (unpublished); see also The Adela, 73 U.S. 266, 267-68 (1867) ("The credibility of the[ witnesses'] statements was much impaired by their evasive character."); Cruz-Rea, 2015 WL 5785744, at *2 ("[The petitioner's] version of events . . . is not credible.  His testimony is internally inconsistent . . . ."); Diaz, 2014 WL 7384974, at *7 (citing, among reasons for rejecting the petitioner's account, fact that "his testimony itself was inconsistent").[10]

_____

[10]  With his Memorandum of Law, Petitioner submitted an affidavit from his wife, in which she stated:

> [Petitioner's trial counsel] told [Petitioner's wife] that the [United States] had offered [Petitioner] a plea deal.  [Petitioner's trial counsel] told [Petitioner's wife] that [the United States] w[as] trying to trick [Petitioner] into signing a plea and that[,] if he signed the plea, he would be signing a plea to a mandatory life
> (continued...)

In sum, given the clear language of Section 851, the experience and reputation of Petitioner's trial counsel, the credible testimony that he correctly advised Petitioner about the sentencing implications of the plea agreement, and the total lack of credibility of Petitioner's contrary testimony, the Court should deem Ground One "wholly incredible," <u>Denton v. Hernandez</u>, 504 U.S.

---

[10](...continued)
sentence.          [Petitioner's   trial   counsel]   told
[Petitioner's wife] to convince [Petitioner] that taking
the plea was not good for him and that he would get a
life  sentence  if  he  took  it.    [Petitioner's  trial
counsel] also told [Petitioner's wife] that trial would
be [Petitioner's] best bet at th[at] point.

(Docket Entry 259-1 at 5.)   Petitioner's wife did not testify at
the evidentiary hearing (<u>see</u> Docket Entry 378 at 2 (listing
witnesses called by Petitioner); Docket Entry 379 at 2 (listing
witnesses called by United States)); he nonetheless "ask[ed] the
Court to consider [her] affidavit[]" (Docket Entry 378 at 159; <u>see
also</u> <u>id.</u> at 160 (inviting later argument about propriety of
"considering  affidavits  from  individuals  who  have  had  the
opportunity to appear at a hearing and . . . have not appeared");
Docket Entry 383 at 9 (discussing Ground One without reference to
affidavit from Petitioner's wife)).   The Court should decline that
request for reasons well-explained by another court years ago:

     Although [an] affidavit [in support of a Section 2255
     motion] must be taken as true for purposes of determining
     whether a hearing on [that] motion is required, unless
     [the affiant] is available to testify in person at the
     hearing,  relief  cannot  be  granted  [based  on  the
     affidavit].   Once [an] affidavit is deprived of the
     assumption of truth . . ., as it would be at a hearing,
     it has no credible weight. . . .  [The affiant was] not
     subject to cross-examination.   The affidavit is thus a
     legally insufficient basis for collateral relief . . . .

<u>Moreno-Ortiz v. United States</u>, 983 F.2d 15, 17 (2d Cir. 1993)
(internal citation omitted).

25, 33 (1992), and thus "factually frivolous," id. "A § 2255 motion which is facially inadequate may be summarily denied, i.e., [the Court may deny claims] stating . . . contentions which are wholly incredible . . . ." United States v. Butt, 731 F.2d 75, 77 (1st Cir. 1984) (internal quotation marks omitted); see also Almonte v. United States, No. 91Civ.6044, 1992 WL 84942, at *1 (S.D.N.Y. Apr. 10, 1992) (unpublished) (dismissing as "frivolous" Section 2255 claims based on "wholly fanciful" allegations). Under these circumstances, the Court should deny Ground One due to the frivolous nature of the factual assertions on which it depends.

Alternatively, even if the Court chose to credit Petitioner's statement(s) that his trial counsel provided a grossly inaccurate account of the authority of the United States to identify prior convictions under Section 851 and the prison term Petitioner faced under Section 841, the record still forecloses relief on Ground One, because he cannot establish prejudice. More specifically:

> To show prejudice from ineffective assistance of counsel where a plea offer has . . . been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it . . . . [Lastly, defendants must] show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

Missouri v. Frye, 566 U.S. 134, 147 (2012).

As documented above, Petitioner's evidentiary hearing testimony precludes a finding of any such prejudice. Most notably, in that testimony, he steadfastly denied guilt on the charge to which the plea agreement required him to admit guilt. (See, e.g., Docket Entry 378 at 160 (denying participation in conspiracy with Jeffries and Poole), 163 ("I was guilty of something, but not what I was accused of."), 168 (disavowing involvement with crack cocaine).) Petitioner therefore cannot "demonstrate a reasonable probability [he] would have accepted the earlier plea offer," Frye, 566 U.S. at 147, or "a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it," id.[11]

These considerations all lead to the conclusion that Ground One fails as a matter of law.

---

[11] Petitioner's suggestion that he might have admitted guilt to another offense (see Docket Entry 378 at 164, 167) does not change the prejudice analysis, because he has not proven that the United States would have offered him such a plea (see Docket Entry 254, ¶ 12(Ground One)(a); see also Docket Entry 259-1 at 2-62 (containing Petitioner's evidence); Docket Entry 378 at 6-216 (documenting testimony from Petitioner's witnesses)). Moreover, as Petitioner did not receive an enhancement to life in prison under Section 841(b)(1)(A), he cannot "show a reasonable probability that the end result of the criminal process would have been more favorable," Frye, 566 U.S. at 147, absent his trial counsel's allegedly errant advice about the prior conviction notice process. Although (after Petitioner rejected the plea agreement) the United States filed a second notice under Section 851 (see Docket Entry 40), it later withdrew that notice because, "[i]n light of United States v. Simmons, 649 F.3d. 237 ([4th Cir.] 2011) (en banc), the conviction used . . ., [wa]s no longer a qualifying 'felony'" (Docket Entry 69 at 1 (internal parallel citation omitted)).

<u>Ground Two:  Ineffective Assistance as to Indictment</u>

Via Ground Two of the Section 2255 Motion, Petitioner alleged ineffectiveness by his trial counsel "for failing to file pre[-]trial objections and defenses to a defect in instituting the prosecution" (Docket Entry 254, ¶ 12(Ground Two) (standard capitalization applied); <u>accord</u> Docket Entry 258, ¶ 12(Ground Two)) and offered these "[s]upporting facts" for that claim:

> Prior to trial, [trial] counsel informed [] Petitioner that [trial counsel] had in his possession documents to show that [the] government had knowingly submitted false statements and evidence to the grand jury.  He stated that he was going to file pre-trial objections and defenses in order to get the indictment dismissed, but [he] failed to do so.  Petitioner later discovered that [trial] counsel did in fact have documents to show that [the] government knowingly submitted false statements to the grand jury.  By failing to file objections and defenses to a defect in instituting the prosecution, [trial] counsel was ineffective and such ineffectiveness waived [] Petitioner's opportunity to have his indictment dismissed.

(Docket Entry 254, ¶ 12(Ground Two)(a).)  Petitioner cannot prevail on this ineffective assistance claim for several reasons.

First, the foregoing conclusory allegations provide no basis for the Court to find that Petitioner's trial counsel should have filed and/or could have won a pre-trial motion to dismiss the indictment due to perjury before the grand jury.  <u>See, e.g.</u>, <u>United States v. Dyess</u>, 730 F.3d 354, 359 (4th Cir. 2013) ("[C]onclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the [d]istrict [c]ourt." (internal

quotation marks omitted)).[12] Nor does the elaboration on Ground Two in Petitioner's Memorandum of Law save this ineffectiveness claim. (See Docket Entry 259 at 12-20.)  To the contrary, Petitioner therein confirmed that he possesses no evidence regarding what information came before the grand jury and instead asks the Court to assume that, because the United States "adopted the state investigation . . . conducted by [Greensboro Police] Detective [Rick] Alston" (id. at 16), the grand jury necessarily relied upon "all documents and statements prepared by Detective Alston" (id.; see also id. at 16-17 (discussing Detective Alston's Incident/Investigation Report (Docket Entry 259-1 at 8-9), Case Supplemental Report (id. at 10), Reporting Officer Narrative (id. at 11), Laboratory Services Request (id. at 13), and Request for Examination of Physical Evidence (id. at 14)).[13]

---

[12] Additionally, to the extent Petitioner would rely on the above-quoted, alleged, out-of-court statement of his trial counsel to establish the truth of the matter asserted, i.e., that documentary proof "showed that [the] government had knowingly submitted false statements and evidence to the grand jury" (Docket Entry 254, ¶ 12(Ground Two)(a); see also Docket Entry 259-1 at 3 (including same conclusory allegations in Petitioner's affidavit)), the statement constitutes rank hearsay, see Fed. R. Evid. 801(c).

[13] In the Memorandum of Law, "Petitioner assert[ed] that Detective Alston testified before the grand jury that Petitioner's prints were on the Kilo Wrappers [seized outside his residence] which is false and the government knew was false." (Docket Entry 259 at 18; see also id. at 19 ("Detective[] Alston's falsifications in his testimony and/or documents prepared by him, which the government presented to the grand jury while being aware of the falsity, substantially influenced the grand jury's decision to
(continued...)

That approach cannot succeed, as illustrated by this adaptation of a nearby court's ruling in an analogous situation:

> [Petitioner] alleges [that his trial] counsel rendered ineffective assistance for failing to move to dismiss the indictment based on perjured testimony before the grand jury. [Petitioner] claims that [Detective Alston or some other witness who relied on Detective Alston's reports] told the grand jury [false information about evidence seized outside Petitioner's] residence . . . . However, [Petitioner] does not cite to any transcript or affidavit to indicate that anyone told the grand jury [false information] . . . . [Petitioner] does not bring to the

---

[13](...continued)
indict . . . ."), 55 (bearing Petitioner's signature, but no indicia of oath or other verification).) Such "unsworn allegations cannot constitute a basis for habeas relief. . . . Facts alluded to in an unsworn memorandum will not suffice." United States v. Rhodes, No. 3:08CR82, 2013 WL 150335, at *3 (E.D. Va. Jan. 14, 2013) (unpublished), aff'd in part and appeal dismissed in part, 531 F. App'x 279 (4th Cir. 2013). Furthermore, Petitioner's affidavit (which he did sign under penalty of perjury (see Docket Entry 259-1 at 4)) omits any account of the evidence tendered to the grand jury. (See id. at 2-4; see also id. at 3 (declaring, as concerns Ground Two, only (and in the same conclusory manner as the factual support for Ground Two in the Section 2255 Motion): "In July of 2011 [my trial counsel] came and saw me in the county jail. He told me that he had some documented evidence that showed that the government presented false statements to the grand jury. He stated that he was going to use that evidence to get the indictment dismissed.").) In contrast, the United States submitted an affidavit from an officer of the Court attesting that "a review of the [grand jury] record reveal[ed] that Detective Alston did not appear at the [g]rand [j]ury on this matter." (Docket Entry 306-4 at 2; see also id. at 6 (setting out affiant's oath).) Petitioner did not present any contrary evidence at the hearing; indeed, in the approximately 120 transcript pages of his testimony, Petitioner adverted to the failure of his trial counsel to move for dismissal of the indictment due to grand jury perjury exactly once and, in so doing, offered no insight into what information the grand jury actually reviewed. (See Docket Entry 378 at 114-15 (testifying that trial counsel "said he had in his possession the reports and [sic] which could prove [Detective] Alston fabricated reports, and [trial counsel] would get the indictment dismissed").)

> [C]ourt's attention any evidence that [Detective Alston
> or any witness who relied on his reports] even testified
> before the grand jury. . . . Accordingly, the [C]ourt
> concludes that [Petitioner] has not demonstrated that
> [his trial] counsel acted deficiently, or that but for
> [his trial] counsel's failure to [file a motion to
> dismiss] alleg[ing] perjury before the grand jury, the
> result of the [case] would have been different.

Washington v. United States, 291 F. Supp. 2d 418, 434-35 (W.D. Va.
2003). In other words, claims (such as Ground Two) that require
"evidence of perjury before the grand jury cannot be based on
speculation." United States v. Nishimura, Cr. No. 11-153, 2012 WL
442840, at *4 (D. Haw. Feb. 10, 2012) (unpublished); see also
United States v. Kalevas, 622 F. Supp. 1523, 1525 (S.D.N.Y. 1985)
("Speculation and surmise as to what occurred before the grand jury
is not a substitute for fact." (internal quotation marks omitted)).

Further, even if Petitioner had established that the grand
jury considered "documents and statements prepared by Detective
Alston" (Docket Entry 259 at 16), "nothing from the record before
the [C]ourt[] demonstrates that the prosecutor knowingly,
deliberately, or even unintentionally sought perjured testimony;
knew [Detective Alston] provided false [information]; or sought to
mislead the grand jury," United States v. Price, Crim. No. 03-147-
1, Civ. Action No. 08-145, 2008 WL 2996232, at *6 (E.D. Pa. Aug. 5,
2008) (unpublished). Simply put, Petitioner's "speculative
accusations that the prosecutor solicited or suborned perjured
testimony are not enough for [Petitioner] to prove that his trial

counsel's performance was deficient for failing to allege prosecutorial misconduct during the grand jury proceedings." Id.; see also Lorenzana v. United States, No. 11 Civ. 6153, 2012 WL 4462006, at *6 (S.D.N.Y. Sept. 27, 2012) (unpublished) ("[The petitioner contends his] counsel was ineffective for failing to argue that the Government committed prosecutorial misconduct. [The petitioner] argues that the Government presented perjured testimony to the Grand Jury . . . . Because [the petitioner] has not provided any facts to support his accusation, this speculative claim does not warrant scrutiny under Strickland.").[14]

Finally, "in order to justify dismissal of an indictment, [grand jury] perjury must be material. . . . The materiality of perjured testimony should not be presumed, and mere speculation cannot justify a court's intervention . . . ." United States v. Jack, No. 2:07CR266, 2010 WL 4718613, at *19 (E.D. Cal. Nov. 12,

_____

[14] The absence of evidence of prosecutorial misconduct similarly means that any challenge to the indictment would have failed. See United States v. James, No. 2:17CR180, 2018 WL 2122835, at *8 (D. Nev. May 4, 2018) (unpublished) ("[The defendant] has not shown that the prosecution has engaged in any misconduct before the grand jury let alone that it engaged in misconduct so excessive, flagrant, scandalous, intolerable, and offensive to amount to a due process violation warranting dismissal [of the indictment]. Accordingly, . . . [the] motion to dismiss [should] be denied."), recommendation adopted, 2018 WL 3518446 (D. Nev. July 20, 2018) (unpublished). Ground Two therefore falters under Strickland not only due to inadequate proof of unreasonable performance by Petitioner's trial counsel, but also for want of any proof of prejudice. See generally Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) ("[A defendant] cannot be prejudiced by his counsel's failure to make a losing objection.").

2010) (unpublished).  Petitioner, however, has not uncovered any material falsity in the "documents and statements prepared by Detective Alston" (Docket Entry 259 at 16) (again, assuming that such materials came before the grand jury).

In the Memorandum of Law, Petitioner sought to prove grand jury perjury by pointing to two purported discrepancies involving six documents.  (See id. at 16-17 (citing Incident/Investigation Report (Docket Entry 259-1 at 8-9), Case Supplemental Report (id. at 10), Reporting Officer Narrative (id. at 11), Laboratory Services Request (id. at 13), Request for Examination of Physical Evidence (id. at 14), and Laboratory Report (id. at 12)).)  As to the first, he argued that the Reporting Officer Narrative contains "a falsification," because (in discussing a trash-pull) it "state[s] that [Detective Alston] found 'several pieces' of discarded mail addressed to [Petitioner and his wife], instead of the one piece of mail that was addressed to [his wife] as [Detective Alston] stated [in the Incident/Investigation Report] and [Case Supplemental Report]."  (Docket Entry 259 at 16-17.)[15] Next, Petitioner noted that the Incident/Investigation Report

---

[15] In fact:  (1) the Incident/Investigation Report does not refer to any specific item(s) of mail (addressed to anyone), but rather mentions only "paperwork" generally (Docket Entry 259-1 at 8 (all-caps font omitted)); and (2) the Case Supplemental Report likewise documents the seizure of "paperwork that had the name [of Petitioner's wife] on it" (not a single piece of mail bearing only that name) (id. at 10 (emphasis added) (all-caps font omitted)).

catalogs the seizure of ".250" of a gram of "[c]ocaine" (Docket Entry 259-1 at 9), which the Case Supplemental Report and Reporting Officer Narrative label a "white powder" (id. at 10, 11 (all-caps font omitted from former)), and the Laboratory Services Request and Request for Examination of Physical Evidence identify as a "[p]owder substance" and "white powder substance," respectively (id. at 13, 14 (all-caps font omitted from latter)), whereas the Laboratory Report describes it as an "off-white hard material" consisting of "less than 0.1 gram" of "Cocaine Base" (id. at 12). (See Docket Entry 259 at 17.)

The United States correctly has observed that, if Petitioner's trial counsel had moved to dismiss the indictment based on such "minor differences" in these reports, "it is apparent that the[ motion] would have been denied." (Docket Entry 306 at 17.) To begin, "[m]ere inconsistency does not establish falsehood . . . ." United States v. Jones, 38 F. App'x 840, 846 (4th Cir. 2002); see also United States v. Johnson, 114 F.3d 476, 483 n.4 (4th Cir. 1997) ("[T]he inconsistencies in the [evidence] upon which [the defendant] relies are by no means necessarily demonstrative of perjury."); Asuncion v. City of Gaithersburg, Md., No. 95-1159, 73 F.3d 356 (table), 1996 WL 1842, at *2 (4th Cir. Jan. 3, 1996) (unpublished) ("[M]ere recitation of factual inconsistency is insufficient to demonstrate perjury . . . ."). Moreover, these "minor inconsistenc[ies are] . . . immaterial and did not prejudice

[Petitioner]." Pope v. Netherland, 113 F.3d 1364, 1371 (4th Cir. 1997); see also United States v. Ricks, No. 86-7636, 810 F.2d 195 (table), 1987 WL 36248, at *2 (4th Cir. Jan. 14, 1987) (unpublished) ("We have examined the transcripts of the witnesses' testimony of which [the petitioner] complains and find nothing more than minor inconsistencies. . . . [The petitioner's] request for relief on this claim must fail."). The futility of pursuing dismissal of the indictment based on immaterial variations within investigative materials defeats any ineffective assistance claim predicated on the absence of such a motion. See Oken v. Corcoran, 220 F.3d 259, 269 (4th Cir. 2000) ("[C]ounsel was not constitutionally ineffective in failing to object . . . because it would have been futile for counsel to have done so . . . .").

The Court therefore should rule Ground Two without merit.[16]

---

[16] During the evidentiary hearing, Petitioner attempted to convert Ground Two from a claim about his trial counsel's failure to seek dismissal of the indictment to a more generalized list of motion-practice grievances. (See Docket Entry 378 at 116-19 (mentioning "issue" about "Atlanta stop," suppression of "trash pulls," "something to do with fingerprints," and "fail[ing] to object to admission of testimony regarding video recordings"); see also id. at 120 (indicating that Petitioner wanted Ground Two to include "pretrial motions for the stop, the pole camera, the trash pull, and the fingerprints"), 184 ("The Court: What did you want [your trial counsel] to suppress? [Petitioner]: The trash pulls, as well as . . . the video from the Atlanta interview, [and] the SBI reports . . . ." (emphasis omitted)).) The Court should not countenance Petitioner's effort to "transform his [Section] 2255 [M]otion into a moving target." United States v. Hale, Crim. No. 07-385, Civ. No. 09-494, 2010 WL 2105141, at *8 n.13 (S.D. Ala. May 24, 2010) (unpublished); see also id. at 9 ("[A]n evidentiary
(continued...)

<u>Ground Three:  Ineffective Assistance as to Complaint</u>

According to Ground Three of the Section 2255 Motion, Petitioner received ineffective assistance because his trial counsel "fail[ed] to object to dismissal of a complaint by the government [in] violation of Fed. R. Crim. P. 48(a)."  (Docket Entry 254, ¶ 12(Ground Three) (standard capitalization applied); <u>accord</u> Docket Entry 258, ¶ 12(Ground Three).)  The "[s]upporting facts" for that claim appear as follows:

> In this case, [] Petitioner was charged in a criminal complaint and was proceeding to the necessary judicial functions when the complaint was terminated (dismissed) without any notice.  The day that [] Petitioner was scheduled to go to court on the complaint, he was arraigned on an indictment.  [Trial c]ounsel did not object to the dimissal [sic] even though it was not in compliance with Rule 48.  So counsel never determined whether there was an actual dismissal or whether it was done in bad or in good faith.  Without this determination there is no way to ascertain if the dismissal was with or without prejudice.  By not determining whether there was an actual dismissal and/or such dismissal was with or without prejudice counsel was ineffective and this eror [sic] was instrumental in Petitioner's waiving of this pre-trial objection, which could determine whether or not subsequent indictments should be dismissed.

---

[16](...continued)
hearing is not a penalty-free second-chance platform for a § 2255 petitioner to raise new claims that he did not think to bring earlier . . . .").  Regardless, Petitioner's further testimony at the evidentiary hearing confirmed that he could not articulate a viable argument that his trial counsel should have presented in a pre-trial motion.  (<u>See</u> Docket Entry 378 at 184-93.)  As a result, Petitioner's "[trial] counsel was not constitutionally ineffective in failing to [file a pre-trial motion] . . . because it would have been futile for counsel to have done so," <u>Oken</u>, 220 F.3d at 269.

(Docket Entry 254, ¶ 12(Ground Three)(a); <u>see also</u> Docket Entry 259 at 24 ("Adherence, or lack thereof, to this rule can ultimately decided [sic] whether or not subsequent indictments, depending on whehter [sic] dismissal is construed with or without prejudice, will be premitted [sic] to utilize the same evidence as was used in the complaint."), 25 ("Being that there was a complete diveregence [sic] from the rule in this matter, . . . there is a reasonable probability that counsel could have secured a dismissal with prejudice for 'bad faith'. Such dismissal with prejudice would have thereafter placed [] Petitioner in a position to have subsequent indictments dismissed, if they were founded on the same evidence that the complaint was founded upon.").) This claim suffers from obvious defects that mark it as frivolous.

On May 10, 2011, the Court (per the undersigned Magistrate Judge) issued an arrest warrant for Petitioner for conspiring (from May 2007 to August 2008) to distribute five kilograms or more of cocaine hydrochloride in violation of Sections 846 and 841(b)(1)(A) (Docket Entry 2), based on a criminal complaint (Docket Entry 1), which (in a federal task force officer's incorporated affidavit) detailed Petitioner's drug activity with Sean Darnell Jeffries, Leonard Gary Williams, and others (<u>see, e.g.</u>, <u>id.</u> at 3-6).[17]

---

[17] Pin citations to the criminal complaint refer to the page numbers that appear in the footer appended upon docketing via the CM/ECF system (not the separate pagination within the affidavit).
(continued...)

Petitioner's arrest and initial appearance occurred the next day. (See Minute Entry dated May 11, 2011; Docket Entry 5.) Six days later, he came before the undersigned Magistrate Judge for preliminary and detention hearings, but "requested a continuance," which "[t]he Court granted . . . until 6/1/11 . . . ." (Minute Entry dated May 17, 2011.)[18] On May 31, 2011, the grand jury indicted Petitioner and Jeffries for participating (along with Williams and others) in a conspiracy (from May 2007 through May 31, 2011) to distribute 280 grams or more of cocaine base in violation of Sections 846 and 841(b)(1)(A). (See Docket Entry 10 at 1.)[19] Given that development, the Clerk's Office administratively terminated activity on the criminal complaint. See Docket Entry, United States v. Benn, No. 1:11MJ107 (M.D.N.C. May 31, 2011).

In the simplest terms, Ground Three confuses that administrative termination by the Clerk's Office (due to the return

---

[17](...continued)
The criminal complaint and arrest warrant originally bore the case number 1:11MJ107. (See Docket Entry 1 at 1; Docket Entry 2 at 1.)

[18] Petitioner's trial counsel filed his notice of appearance on May 25, 2011. (Docket Entry 7.) Prior to that date, different counsel (appointed at Petitioner's initial appearance) represented him. (See Docket Entry 6; see also Docket Entry 18 (granting said counsel's Motion to Withdraw (Docket Entry 13)).)

[19] The grand jury subsequently amended the conspiracy count to charge other defendants, to extend the time period of the conspiracy back to June 2006, and to add distribution of five kilograms or more of cocaine hydrochloride as a second object of the conspiracy. (See Docket Entry 43 at 1-2.)

of an indictment) with a dismissal by the United States pursuant to Federal Rule of Criminal Procedure 48(a). "A criminal complaint only authorizes a judge to issue an arrest warrant." United States v. Heard, No. 17CR82, 2018 WL 3478901, at *2 (N.D. Iowa July 19, 2018) (unpublished) (citing Fed. R. Crim. P. 4(a)). If, as in this case, an offense carries the possibility of "imprisonment for more than one year," Fed. R. Crim. P. 7(a)(1), it "must be prosecuted by an indictment," id.; see also Heard, 2018 WL 3478901, at *2 ("A trial on a felony charge must be based on an indictment by a grand jury."). Furthermore, the transition from arrest upon a criminal complaint to prosecution via indictment must occur rapidly (as it did here). See 18 U.S.C. § 3161(b) ("Any . . . indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested . . . ."). In sum, "the [criminal] complaint [wa]s the temporary charging document, and [wa]s superseded once the more formal charging document [i.e., the indictment, wa]s filed." 1 Charles Alan Wright et al., Federal Practice and Procedure, Crim. § 41 (4th ed. Apr. 2019 update) (emphasis added); see also United States v. Flick, No. 1:18CR9, 2019 WL 981642, at *1 (S.D. Ind. Feb. 28, 2019) (unpublished) ("[T]he [i]ndictment supersedes the complaint."); United States v. Freund, No. 08CR1324, 2008 WL 4693245, at *1 n.1 (N.D. Iowa Oct. 24, 2008) (unpublished) ("The [i]ndictment superseded the [c]riminal [c]omplaint.").

Because the United States properly superseded the criminal complaint by obtaining an indictment within 30 days of Petitioner's arrest, it neither needed to nor did seek, "with leave of court, [to] dismiss . . . [the] complaint," Fed. R. Crim. P. 48(a); see also Fed. R. Crim. P. 48 advisory comm. n., 1944 adoption, subdiv. (a) ("The word 'complaint' was included [in this rule only] . . . to resolve a doubt prevailing in some districts as to whether the United States attorney may file a nolle prosequi between the time when the defendant is bound over [after an arrest] . . . and the finding [by the grand jury] of an indictment.").[20]  In any event, if a dismissal under Federal Rule of Criminal Procedure 48(a) should have happened, "the authorities are replete that such a dismissal is without prejudice," United States v. Chase, 372 F.2d 453, 463 (4th Cir. 1967); see also Heard, 2018 WL 3478901, at *2 ("[The d]efendant's argument is based on the faulty premise that the [criminal c]omplaint formed the basis for his trial and

---

[20] That timely and appropriate action by the United States likewise forecloses:  (A) any finding by the Court that the United States acted in bad faith or otherwise undermined "[t]he principal object of the 'leave of court' requirement [in Federal Rule of Civil Procedure 48(a) of] . . . protect[ing] a defendant against prosecutorial harassment, e.g., charging, dismissing, and recharging . . . over the defendant's objection," Rinaldi v. United States, 434 U.S. 22, 29 n.15 (1977); and (B) any possibility that the Court could have "dismiss[ed the] indictment . . . [because] unnecessary delay occur[red] in . . . presenting a charge to a grand jury," Fed. R. Crim. P. 48(b).

conviction. . . . [His] prosecution and trial would have proceeded regardless of whether th[at c]omplaint [was dismissed] . . . .").

Under these circumstances, Ground Three so clearly affords no basis for collateral relief that it qualifies as frivolous.[21]

Ground Four:  Ineffective Assistance as to Surveillance Testimony

The Section 2255 Motion's fourth ground states that Petitioner suffered ineffective assistance because his trial counsel "fail[ed] to contest the permittance [sic] of testimony by [a] government witness testifying to allegedly destroy [sic] video footage." (Docket Entry 254, ¶ 12(Ground Four) (standard capitalization applied); see also Docket Entry 258, ¶ 12(Ground Four) (articulating claim as "Ineffective Assistance of Counsel for Failing to Object to the Admission of Testimony which was Attempting to Prove the Content of a Video Recording").)  For its "[s]upporting facts," Ground Four relies on the following:

> Petitioner's [trial] counsel was ineffective for failing to object to the permittance [sic] of evidence (testimony) that was used to describe events on video footage.  In his trial testimony, Detective Alston testified to events from video footage without being required to produce the original footage.  The Government alleged that the video footage was destroyed and evidence would not be used from said video, but [Detective] Alston's testimony alleged events that happened during

---

[21] Petitioner's appointed counsel reached the same conclusion and therefore refused to pursue Ground Three.  (See Docket Entry 378 at 145; Docket Entry 383 at 10.)  The undersigned Magistrate Judge nonetheless allowed Petitioner to testify at the evidentiary hearing about this claim.  (See Docket Entry 378 at 139-47.)  That testimony does not alter the above analysis. (See id.)

the period that the recordings were being implemented.
By failing to object to said testimony[, trial] counsel
prejudiced Petitioner because [the] jury was permitted to
hear damaging testimony about events from an allegedly
destroyed footage.   This testimony was key because it
went over two years of video footage from a three year
investigation.

(Docket Entry 254, ¶ 12(Ground Four)(a).)   This claim lacks merit.

Prior to Petitioner's trial, in a hearing before now-Chief Judge Schroeder, the United States confirmed that:

1) "at one point in time there was a pole camera [with a view of Petitioner's residence]" (Docket Entry 196 at 14);

2) the United States "ha[d] disclosed the notes that were taken as officers were reviewing the pole camera [video]" (id.);

3) prior to Petitioner's indictment, "the actual video from that pole camera was videotaped over" (id. at 14-15);

4) in its case-in-chief, the United States would not "seek to introduce information from the notes because [it] could not comply with giving [Petitioner] the actual recordings" (id. at 15);

5) "any evidence[ the United States would introduce in its case-in-chief] . . . would have to be actual direct surveillance from the officers without any aid of any pole camera" (id.); and

6) although the United States "would not intend in its case[-]in[-]chief to present anything with regard to the notes, . . . if a door [wa]s open[ed by Petitioner, the United States reserved the right to] ask[] questions [about them]" (id. at 16).

Consistent with the commitment of the United States not to rely on the pole camera notes during its case-in-chief, in testifying at trial about the regular presence at Petitioner's residence of not only Petitioner and his wife, but also Jeffries, Williams, and others (see Docket Entry 205 at 71-73, 93-96), Detective Alston described only matters he observed during his "physical surveillance" (id. at 71 (emphasis added); see also id. at 94 ("Q And just so we are clear, when I say 'surveillance,' is that actual physical surveillance there at the location? A Yes, physical surveillance.")). Petitioner's Memorandum of Law "contends that [Detective] Alston's trial testimony in [sic] this issue was based off the contents of the camera recordings of the residence." (Docket Entry 259 at 29; see also id. (offering Petitioner's "conclu[sion] that [Detective] Alston's testimony was not based on him actually being at [Petitioner's residence], but instead testifying to content, while the government was proving the content of recordings from the residence").) However, Petitioner has not come forward with any evidence to support that contention/ conclusion; rather, he simply has "reasoned that it is a falsification that [Detective] Alston installed a 24 hour recording device and then sat at the very location where the device was

installed for over a 1000 hours to 'physically survey' what the device was already recording."  (Id.)[22]

As the United States has observed, "Petitioner's conclusion [that Detective Alston testified falsely about physically surveilling Petitioner's residence] is insufficient to support a finding that [his trial counsel] was ineffective [for not objecting to that testimony]."  (Docket Entry 306 at 21.)  In the words of another court's adjudication of a similar ineffectiveness claim:

> Petitioner has offered no evidence, outside of conclusory statements, that substantiates a claim that [the cited] testimony was false, that the government knew [the cited] testimony was false when it was offered as evidence, or that [Petitioner's trial] counsel knew that the [cited] testimony was false when he chose not to object.  As such, Petitioner has given the Court no reason to find [Petitioner's trial] counsel's decision not to object to the presentation of the evidence at issue unreasonable.

Kelso v. United States, Nos. 3:06CR147, 3:13CV583, 2016 WL 6804383, at *10 (E.D. Tenn. Nov. 16, 2016) (unpublished), appeal dismissed,

---

[22] Although Petitioner referenced the pole camera notes during his evidentiary hearing testimony, he did so in the context of arguing that his trial counsel should have brought out purported conflicts between the pole camera notes and co-conspirator/witness testimony because Detective Alston opened the door to discussion of the pole camera notes by denying having done 24-hour surveillance of Petitioner's residence (not in connection with what his Reply described as the "core" of his claim in Ground Four, i.e., that, at trial, Detective Alston "provid[ed] answers from the contents of the pole [camera] recordings and notes from said recordings" (Docket Entry 319 at 6; see also id. ("Putting it in another way, a great deal of Detective Alston's testimony came from him reviewing video footage and notes from that footage and not from him actually being at [] Petitioner's residence.")).  (See Docket Entry 378 at 111-14, 120-22, 148-50, 173-79, 182-83, 211-13.)

No. 17-5397, 2017 WL 8786157 (6th Cir. Oct. 18, 2017) (unpublished); see also McLean v. United States, Nos. 08CR789, 12CV1954, 7362, 7559, 2016 WL 3910664, at *11 (S.D.N.Y. July 13, 2016) (unpublished) ("[The petitioner's] counsel cannot be considered ineffective for failing to object to testimony that [the petitioner] has not shown to be false."), appeal dismissed, No. 16-2702, 2016 WL 9447127 (2d Cir. Dec. 5, 2016) (unpublished).[23]

Ground Four falls short as a result.

Ground Five:  Ineffective Assistance due to Lack of Communication

In Ground Five of the Section 2255 Motion, Petitioner has asserted a claim for ineffectiveness by trial counsel "for failing to inform [sic], explain, or discuss trial strategy with Petitioner before and during trial."  (Docket Entry 254, ¶ 12(Ground Five) (standard capitalization applied); see also Docket Entry 258, ¶ 12(Ground Five) (listing claim as "Ineffective Assistance of Counsel for Failing to Interview Petitioner About Matters in the Case, Go Over the Discovery Material with [] Petitioner and Inform [sic] or Explain the Trial Strategy with Petitioner").)  To support that claim, Ground Five declares that:

> Petitioner's [trial] counsel never discussed with []
> Petitioner the trial strategy with him [sic].  [Trial
> c]ounsel never interviewed Petitioner about specifics of

---

[23] Without competent evidence of false testimony, Petitioner also cannot prove prejudice.  See generally Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) ("[A defendant] cannot be prejudiced by his counsel's failure to make a losing objection.").

38

> the case, nor did he go over discovery with []
> Petitioner. Petitioner even requested to [trial] counsel
> that he wanted to go over trial strategies, but [trial]
> counsel always had an excuse why there was no need to or
> he couldn't get the materials in the jail. [Trial
> c]ounsel's actions prejudice [sic] [] Petitioner because
> there is no way [trial] counsel could have prepared an
> adequate defense without communicating with Petitioner.

(Docket Entry 254, ¶ 12(Ground Five); see also Docket Entry 259-1

at 3-4 ("[Trial counsel] never went over my [d]iscovery material

with me in the federal case. . . . [He] never interviewed me about

the specifics of the case. He never asked me the relationships

between me and people who be [sic] testifying against me or co-

defendants or anything related to the case in general. [He] also

never discussed with me trial strategy that he would pursue. . . .

[He] failed to give any explanation into how to decipher the

[discovery] material in relation to trial."); Docket Entry 378 at

100 (documenting Petitioner's evidentiary hearing testimony that

trial counsel "never brought [Petitioner] any discovery to the

jail"), 101 ("Q. Okay. So [your trial counsel] never came and

discussed the discovery with you in the jail? A. No, sir."), 168

("[Petitioner and his trial counsel] did not sit down and review

[the discovery] together."), 169 ("[Trial counsel] did not review

[the] discovery with [Petitioner] personally.").)

The Court should reject this claim. As an initial matter, "no

case establish[es] a minimum number of meetings between counsel and

client prior to trial necessary to prepare an attorney to provide

effective assistance of counsel . . . ."  <u>Kleba v. McGinnis</u>, 796
F.2d 947, 954 (7th Cir. 1986); <u>see also</u> <u>Murray v. Maggio</u>, 736 F.2d
279, 282 (5th Cir. 1984) ("[B]revity of consultation time between
a defendant and his counsel, alone, cannot support a claim of
ineffective assistance of counsel."); <u>Birnie v. United States</u>, Nos.
1:07CV1141, 1152, 2010 WL 233998, at *3 (W.D. Mich. Jan. 13, 2010)
(unpublished) ("Movants emphasize their disappointment with [their]
counsel's . . . lack of communication during the pretrial phase of
the case.   However, in evaluating a claim of ineffective
assistance, subjective dissatisfaction carries no weight."
(internal quotation marks omitted)).  Further, the credible record
evidence shows that, contrary to Petitioner's above-quoted,
conclusory allegations, trial counsel reasonably consulted with
Petitioner (including about discovery and trial strategy) and
otherwise reasonably prepared for (and defended him at) trial.  In
that regard, Paralegal Crowder credibly testified that:

    1) prior to Petitioner's arrest on the instant federal
charges, he came to trial counsel's office for multiple meetings
and, after Petitioner's arrest on the instant federal charges,
trial counsel both visited Petitioner in custody and spoke to him
by telephone (<u>see</u> Docket Entry 378 at 33-34, 47, 49);

    2) in those telephone conversations, Paralegal Crowder heard
Petitioner "always want[ing] to talk about the strategies for
. . . the case that [trial counsel] had already laid out or planned

out; and if he had any at that time, he would always give that information to [Petitioner]" (id. at 51; see also id. at 48 ("[Petitioner's wife] reached out to [Paralegal Crowder] a lot with questions about [Petitioner] that she wanted [Paralegal Crowder] to relay to [trial counsel] and [Paralegal Crowder] was also reaching out to [Petitioner's wife] to answer her questions . . . ."), 54-55 ("[Petitioner] would continuously ask the same questions over and over, as if he needed reassurance, whether [trial counsel] told [Petitioner], 'This is how it is. This is our strategy and this is what we're going to do.' We may get a call back that afternoon or an e-mail or a call from his wife that she had spoken with [him] and he had more questions to ask through her to us about the strategies of the trial and the case."));

3) Petitioner's trial counsel took "time to speak to [Petitioner] about the discovery," as well as "about the trial strategy" (id. at 55; see also id. at 67-68 (affirming that Petitioner's trial counsel followed "practice" of taking laptop computer to review discovery "with inmates in the jail" and reported visiting Petitioner in custody for that purpose), 69 (stating that, at direction of Petitioner's trial counsel, she sent copies of discovery to Petitioner or his family)); and

4) of the "many multidefendant drug cases" Petitioner's trial counsel handled over the 15-plus years Paralegal Crowder worked with him, Petitioner's case "[r]anked second in the amount of time

that not only [trial counsel] spent researching and working on the
case, but also pacifying the family: [Petitioner], [his wife],
[his] sister [], and anybody else of that family that [Petitioner]
gave [trial counsel] authority to talk to" (id. at 54).[24]

In consistent fashion, Attorney Johnson[25] credibly testified:

1) "there were numerous meetings of the lawyers [representing
Petitioner and his three co-defendants] that [Petitioner's trial
counsel] had input in" (id. at 16; see also id. at 20
("[Petitioner's trial counsel] helped get[ Attorney Johnson] up to
speed with an overview of the whole case as to what [Petitioner's

---

[24] Statements made by trial counsel (as an officer of the
Court) – at a hearing on June 13, 2012, regarding his Motion to
Withdraw as Counsel (Docket Entry 119), in response to Petitioner's
(post-trial/pre-sentencing) letter to the Court dated May 22, 2012,
raising various complaints about trial counsel (see id. at 5-6) –
corroborate Paralegal Crowder's above-described testimony. (See
Docket Entry 235 at 7-8 ("I could make a pretty good accounting of
hundreds of hours that I've spent from start to finish in this
case. . . . [T]here were just scores of hours spent in
preparation, research, considerations of trial strategy, [and]
meetings with other counsel, . . . requiring all of the experience
I could summon from my 43 years [of law practice]. . . . I gave it
my very best shot."); see also Oral Order dated June 13, 2012
(denying Motion to Withdraw as Counsel); Docket Entry 235 at 6
(documenting that, when asked, on June 13, 2012, if the Court "were
to grant the [M]otion [to Withdraw as Counsel] and let [trial
counsel] out, would [Petitioner] object," Petitioner stated "Yes, I
would"), 12-13 ("The Court: . . . [Y]ou want [trial counsel] to
be your lawyer at least for now; is that right? [Petitioner]:
Yes, sir. . . . The Court: . . . I am going to have [trial
counsel] remain in the case for now . . . ." (emphasis omitted)).)

[25] As noted in connection with Ground One, Attorney Johnson
practiced law "[s]ince 1989 in this [C]ourt" (Docket Entry 378 at
6) and defended one of Petitioner's co-defendants (see id. at 7).

trial counsel] thought or where he thought it was going to go, [as well as] . . . which defendant was what and where they came in.”));

2) Petitioner's trial counsel "knew what he was doing," "grasp[ed] the facts," and "had a very good understanding [of the discovery]" (id. at 17; see also id. (recounting that Petitioner's trial counsel helped Attorney Johnson "get[] up to speed on the discovery because there was a volume of it"); and

3) notwithstanding the fact that "[t]he Government had strong evidence against [Petitioner]," his trial counsel "did what he could do to potentially poke holes in that case," was "consistent in his trial strategy," and was "engaged when he had to question witnesses" (id. at 18; see also id. at 22-23 (confirming that Petitioner's trial counsel "ask[ed] appropriate questions" and "cross-examin[ed] on matters that needed [it]")).

The attorneys defending Petitioner's other co-defendants (see Docket Entry 379 at 5-6, 20) likewise gave credible testimony that:

1) they participated in "strategy" sessions with Petitioner's trial counsel (id. at 6-7, 23);

2) Petitioner's trial counsel "appeared to have a pretty good command of the case" (id. at 7) and "[h]is questions appeared to be clear, well thought out, direct, [and] relevant" (id. at 9; see also id. at 10-11 (indicating that Petitioner's trial counsel did not merely repeat questions asked by other defense attorneys), 24 ("I don't recall a time and I don't remember a time when I thought

43

that [Petitioner's trial counsel] had failed to competently address a witness or make a motion or respond to an argument, an objection. I don't recall a time when that occurred.")); and

3) Petitioner's trial counsel also "ha[d] discussions [with Petitioner] about issues . . . [t]hroughout the entire trial" (id. at 11; see also id. ("In fact, that went on a lot and I remember that because there would be times they would be talking and I was trying to ask a question and it would kind of distract me.")).[26]

On the other hand, Petitioner's "version of events . . . is not credible. His testimony is internally inconsistent . . . ." Cruz-Rea, 2015 WL 5785744, at *2.[27] For example, Petitioner testified that, during "the entire time [he] w[as] in jail on this case" (Docket Entry 378 at 122), he "saw" his trial counsel "[s]ix times" (id.), in visits "spaced throughout the time [he] w[as] in jail . . . [rather than] bunched up . . . towards the beginning or the end of the representation" (id. at 123). However, that account

---

[26] In deeming credible the above-cited testimony of Paralegal Crowder and counsel for Petitioner's co-defendants, the undersigned Magistrate Judge took note of the delivery of such testimony in a "matter-of-fact, not adversarial, . . . tone," Diaz, 2014 WL 7384974, at *5, and the lack of "evidence that [those witnesses] had any incentive to lie," Solomon, 24 F. App'x at 151 n.1.

[27] Furthermore, Petitioner possessed "an obvious incentive to misstate the truth," Cruz-Rea, 2015 WL 5785744, at *2, because this collateral challenge "represents perhaps the only remaining avenue open to [him] to potentially escape service of the extended prison term imposed on him," Diaz, 2014 WL 7384974, at *8.

does not match other aspects of Petitioner's testimony about the time-line of his in-person interactions with his trial counsel.[28]

To begin, the record reflects these key events during Petitioner's representation by his trial counsel, which spanned slightly more than a year from May 2011 through June 2012: Petitioner came into federal custody and his trial counsel gave notice of appearance in May 2011. (See Docket Entry dated May 11, 2011; Docket Entry 7.) The United States offered Petitioner a plea agreement in July 2011, which he declined on or before August 8, 2011. (See Docket Entry 306-4 at 2 (discussing rejected plea agreement (id. at 7-12) and subsequent filing of second information

---

[28] Petitioner's above-quoted testimony also conflicts with the Memorandum of Law, in which he "assert[ed] that his [trial] counsel came to see him approximately six times" (Docket Entry 259 at 34), but placed five of those six meetings within the narrow window between May 16 and September 8, 2011, and the sixth visit some time before trial (see id. at 34-35). The Memorandum of Law's description of the number and content of such pre-trial meetings also diverges from Petitioner's evidentiary hearing testimony. (Compare id. (listing topics of trial counsel's six jail visits before trial as (A) "retaining of [trial] counsel's services," (B) "a plea," (C) "further discussion about a plea agreement" and "proof that the government knowingly presented false statement to the grand jury," (D) prospect that Petitioner would "receive[] a superseding indictment for not accepting the plea offer," (E) "Petitioner['s] request[] that [trial] counsel go over trial strategy and [d]iscovery material," and (F) "[trial] counsel telling [Petitioner] that [trial counsel] was preparing a strategy with the co-counsel"), with Docket Entry 378 at 123 ("[T]he first time was . . . the money for the retainer fee. The second time was him trying to get me a bond. The third time it would have been . . . the plea . . . . The fourth time he was going through the things with the other counsels. . . . [T]hey was [sic] formulating . . . a strategy."), and 214 (averring that, after fourth meeting, Petitioner "never saw [trial counsel] again until trial").)

of prior conviction (Docket Entry 40)).) Petitioner's trial began on February 13, 2012. (See Docket Entry 197.) His sentencing occurred on June 26, 2012. (See Docket Entry 232.) The Court (per now-Chief Judge Schroeder) entered Petitioner's Judgment on July 5, 2012 (see Docket Entry 141), two days after the Clerk received Petitioner's premature notice of appeal (see Docket Entry 140; see also Docket Entry 151 (documenting Fourth Circuit's appointment of new appellate counsel for Petitioner on August 16, 2012)).

In testifying about his trial counsel's first four jail visits, Petitioner described their discussions as follows: "[T]he first time was . . . the money for the retainer fee. The second time was him trying to get me a bond. The third time it would have been . . . the plea . . . . The fourth time he was going through the things with the other counsels. He was going through the discovery with the other counsels. . . . [T]hey was [sic] formulating . . . a strategy." (Docket Entry 378 at 123; see also id. at 124 (averring that fourth meeting also concerned Petitioner "asking for a bond," but not "[a]ny other subjects").) Petitioner thereafter elaborated that, at the fourth meeting, his trial counsel said "he was going with the other defendants' counsel to discuss strategy and he would let [Petitioner] know what they came up with [but] never came back . . . . [Petitioner] never saw him again until trial." (Id. at 214.) Beyond those four meetings,

Petitioner testified about only one other such visit, "right after [he] was found guilty and all of that." (Id. at 99.)

Thus, after Petitioner first swore that, while "in jail on this case" (id. at 122), he "saw" his trial counsel "[s]ix times" (id.), in visits "spaced throughout the time [he] w[as] in jail . . . [not] bunched up . . . towards the beginning or the end of the representation" (id. at 123), Petitioner later testified to five custodial meetings with his trial counsel, three compressed into the first two and a half months of his detention (from mid May to early August 2011) (see id. at 123), only one held in the ensuing six-month period leading up to his trial in February 2012 (see id. at 123-24, 214), and a final one conducted within the four months after his trial and before his sentencing on June 26, 2012 (see id. at 99, 110). The conflicting nature of these accounts undermines the credibility of Petitioner's testimony about his personal interactions with his trial counsel and precludes a finding of professionally unreasonable communication about discovery and trial strategy (particularly in light of the credible evidence from Paralegal Crowder and the attorneys for Petitioner's co-defendants, which demonstrates that Petitioner's trial counsel handled such matters appropriately, as well as the "strong presumption that [his] conduct f[e]ll[] within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689).

In the alternative, Ground Five affords no basis for relief because Petitioner has not proven prejudice under <u>Strickland</u>. Indeed, in the Memorandum of Law, Petitioner expressly foreswore any attempt to establish such prejudice as to Ground Five, instead "contend[ing] that prejudiced [sic] can be presumed in this case, simply becuase [sic] there is no way that [his trial] counsel could have constructed and implemented an adequate defense without involving [] Petitioner in the process of his own defense. This claim represents the third distinct situation set forth by the Supreme Court in [<u>United States v.</u>] <u>Cronic</u>[, 466 U.S. 648 (1984)]." (Docket Entry 259 at 37 (underscoring added).) The Court should rebuff Petitioner's effort to shoehorn Ground Five into <u>Cronic</u>'s narrow third exception to <u>Strickland</u>'s prejudice requirement.

By way of background:

In *Cronic*, [the Supreme Court] considered whether the [Sixth Circuit] was correct in reversing a defendant's conviction under the Sixth Amendment without inquiring into [the defendant's] counsel's actual performance or requiring the defendant to show the effect it had on the trial. [The *Cronic* Court] determined that the [Sixth Circuit] had erred . . . . In the course of deciding this question, [the *Cronic* Court] identified three situations implicating the right to counsel that involved circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.

First, and most obvious was the complete denial of counsel. . . . Second, [the *Cronic* Court] posited that a similar presumption was warranted if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. <u>Finally, [the *Cronic* Court] said</u>

> that in cases like *Powell v. Alabama*, 287 U.S. 45 (1932),
> where counsel is called upon to render assistance under
> circumstances where competent counsel very likely could
> not, the defendant need not show that the proceedings
> were affected.

Bell v. Cone, 535 U.S. 685, 695-96 (2002) (internal brackets, quotation marks, and some citations omitted) (emphasis added). "Absent these narrow circumstances of presumed prejudice under *Cronic*, defendants must show actual prejudice under *Strickland*." Glover v. Miro, 262 F.3d 268, 275 (4th Cir. 2001).

As quoted above, Petitioner has invoked Cronic's third prong, which applies only if "'the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial,'" id. (quoting Cronic, 466 U.S. at 659-60). Notably, "[s]ince 1984, the time the [Supreme] Court articulated the tests for actual and per-se prejudice in *Strickland* and *Cronic*, it has never once found per-se prejudice under this third prong of *Cronic*." Id. at 277. Moreover, "[t]he circumstances of this case are nowhere close to *Powell*," id. at 278,[29] the lone case the Cronic Court singled out as an exemplar for

---

[29] The Fourth Circuit has summarized that:

*Powell* . . . involved the infamous trial of several African-American men who faced the death penalty for raping a white woman on a train in Alabama. . . . [T]he [trial] court appointed all members of the bar as counsel
<span style="float:right">(continued...)</span>

that third category, <u>see</u> <u>Bell</u>, 535 U.S. at 696 (citing <u>Cronic</u>, 466 U.S. at 659-62, in turn discussing <u>Powell</u>, 287 U.S. at 53, 56-58).

"Courts have been reluctant to extend a rule of per se prejudice in any new direction and the [C]ourt [should] decline[] to do so here . . . [where] Petitioner's primary complaint with regard to constructive denial [of counsel] is . . . that [trial counsel] failed to communicate with [Petitioner] as often as he deemed sufficient." <u>Knight v. Phillips</u>, Nos. 05CV2749, 2758, 2012 WL 5955058, at *20 (E.D.N.Y. Nov. 28, 2012) (unpublished) (internal citations, italics, and quotation marks omitted); <u>see also</u> <u>United States v. Whitsell</u>, No. 09CR20236, 2015 WL 1867276, at *8 (E.D. Mich. Apr. 23, 2015) (unpublished) ("[The p]etitioner's perception of a lack of communication with [his counsel] does not amount to a complete denial of counsel. To reiterate, a total absence of counsel must be shown in order to benefit from the *Cronic* presumption."). Consequently, Ground Five fails as a matter of law due not only to the inadequate proof of deficient performance by

---

[29](...continued)
for purposes of arraignment. On the day of the trial six days later, a lawyer from another state appeared, but stated that he had not had an opportunity to prepare the case . . . . The [trial] court [however] decided that the out-of-state lawyer would represent the defendants with whatever help the local bar could provide.

<u>Glover</u>, 262 F.3d at 277-78 (internal citations and quotation marks omitted).

his trial counsel, but also the inapplicability of <u>Cronic</u>'s third

exception to <u>Strickland</u>'s prejudice requirement.[30]

<u>Ground Six:  Ineffective Assistance as to Impeachment</u>

Ground  Six  of  the  Section  2255  Motion  alleges  that

Petitioner's  trial  counsel  provided  ineffective  assistance  by

"failing to impeach key government witnesses with other available

evidence that demonstrate [sic] [they] had lied" (Docket Entry 254,

¶ 12(Ground Six) (standard capitalization applied); <u>see also</u> Docket

Entry 258, ¶ 12(Ground Six) (claiming "Ineffective Assistance of

Counsel for Failing to Impeach Key Government Witnessess [sic] and

Present Exculpatory Evidence")), with this basis:

> Counsel for [] Petitioner had in his possession documents
> to impeach Detective Alston.  There was also testimony

---

[30] Because Petitioner relied entirely on <u>Cronic</u>'s third species
of  presumed  prejudice,  he  "has  not  even  alleged  factually  how
additional time with his [trial] counsel would have aided his case
.  .  .  .  [He]  cannot  therefore  show  prejudice;  the  mere  fact  that
[his  trial]  counsel  spent  little  time  with  him  is  not  enough  under
<i>Strickland</i>,  without  evidence  of  prejudice  or  other  defects."
<u>Bowling v. Parker</u>, 344 F.3d 487, 506 (6th Cir. 2003); <u>see also</u>
<u>Kleba</u>, 796 F.2d at 954 ("[E]ven if we were to consider the failure
to confer with [the petitioner] more frequently prior to trial as
deficient  performance  on  the  part  of  [counsel],  [the  petitioner]
has  also  failed  to  affirmatively  prove  prejudice  as  a  result  of
[counsel's]  failure  to  meet  more  frequently  with  [the  petitioner]
prior  to  trial."  (internal  quotation  marks  omitted));  <u>Raposo v.</u>
<u>United States</u>,  Nos.  98CR185,  01CV5870,  2004  WL  1043075,  at  *3
(S.D.N.Y.  May  7,  2004)  (unpublished)  ("[The p]etitioner does not
identify  how,  if  at  all,  he  was  prejudiced  by  his  attorney's
alleged failure to communicate, nor how his position at trial would
have been improved with additional opportunities for consultation
with his attorney.  Accordingly, [the attorney's] alleged failure
to communicate with [the p]etitioner is inadequate to sustain [his]
claim of ineffective assistance of counsel.").

and documents to impeach several of the government's key witness [sic]. The testimony that was impeachable was key in placing drugs in [] Petitioner's possession and impeaching these witness [sic] would have removed drugs from Petitioner's possession and show [sic] that other alleged facts were untrue.

(Docket Entry 254, ¶ 12(Ground Six); <u>see also</u> Docket Entry 259 at 39-47 (arguing that Petitioner's trial counsel should have impeached testimony of (A) Detective Alston about trash-pull at, as well as surveillance of, Petitioner's residence, (B) Williams about disposition of cocaine obtained in trip to Atlanta, (C) Jacqueline Adams about hours she visited Petitioner's residence, (D) Helen Grier about her presence at Petitioner's residence after Atlanta trip, and (E) Jennifer Lindley about testing of evidence from trash-pull at Petitioner's residence).)[31] Petitioner cannot secure relief with these attacks on his trial counsel's representation.

Resolution of Ground Six must begin from this premise:

In considering a Sixth Amendment ineffectiveness claim, a reviewing court does not "grade" the lawyer's trial performance; it examines only whether his [or her] conduct was reasonable "under prevailing professional norms," and in light of the circumstances. Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

_____

[31] According to the Memorandum of Law, "[t]he above mentioned evidence is not only impeaching, but it is also exculpatory" (Docket Entry 259 at 47), because it "goes to the heart of [Petitioner's] guilt or innocence" (<u>id.</u> at 48).

Carter v. Lee, 283 F.3d 240, 248-49 (4th Cir. 2002) (internal citation omitted) (quoting Strickland, 466 U.S. at 697, 688, and 689, respectively).

Furthermore, as courts across the nation (including in the Fourth Circuit) have held, "cross-examination of [witnesses] falls within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight by this Court." United States v. Steele, 727 F.2d 580, 591 (6th Cir. 1984); accord Kessler v. Cline, 335 F. App'x 768, 770 (10th Cir. 2009) ("[T]he manner in which counsel cross-examines a particular witness is a strategic choice and therefore virtually unchallengeable." (quoting Strickland, 466 U.S. at 690)); Barnes v. United States, 859 F.2d 607, 608 (8th Cir. 1988) ("[C]ross-examination techniques are matters of trial strategy left to the discretion of counsel."); Plunkett v. United States, Nos. 4:04CR70083, 4:09CV80205, 2011 WL 2199174, at *16 (W.D. Va. June 6, 2011) (unpublished) ("[T]actical decisions such as the scope and particular emphases of particular bouts of cross-examination are precisely the type of matters presumed to be within the core competence of an attorney."), appeal dismissed, 471 F. App'x 197 (4th Cir. 2012); Mosley v. United States, Crim. No. 03-194, Civ. No. 07-1520, 2011 WL 1230888, at *2 (D. Md. Mar. 29, 2011) (unpublished) ("[T]actical decisions such as what questions to ask of witnesses are virtually unchallengeable." (internal quotation marks omitted)); Higgs v. United States, 711 F.

Supp. 2d 479, 515 (D. Md. 2010) ("[C]ounsel constantly must decide what questions to ask and how much time to spend on a particular witness. These are precisely the types of tactical decisions a court is not supposed to second guess."), aff'd, 663 F.3d 726 (4th Cir. 2011). Accordingly, Ground Six "fails under [Strickland's] performance prong because trial counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy." Stewart v. United States, Nos. 5:14CR90, 5:16CV432, 2017 WL 3025867, at *4 (E.D.N.C. July 17, 2017) (unpublished) (internal quotation marks omitted); see also Fuller v. United States, No. 4:13CR72, 2018 WL 3398129, at *13 (E.D. Va. July 11, 2018) (unpublished) ("[C]ross-examination . . . and the handling of [witness] testimony are decisions of trial strategy and do not rise to the level of ineffective assistance of counsel.").

Nor does the record contain evidence that would permit the Court (A) to disregard the strong presumption that Petitioner's trial counsel exercised his professional discretion to cross-examine witnesses pursuant to his strategic and tactical vision and/or (B) to second-guess those discretionary choices. In so concluding, the Court first should note that, of what the Fourth Circuit termed the "numerous witnesses"[32] whose testimony proved

_____

[32] The record documents testimony by 43 witnesses called by the United States at Petitioner's multi-week trial. (See Docket Entry 198 at 2; Docket Entry 200 at 2-3; Docket Entry 201 at 2-3; Docket (continued...)

that Petitioner "agree[d] with at least one [co-defendant] to commit the charged crimes, that [he] knew of the conspiracy, and that [he] knowingly and voluntarily became part of the conspiracy," Benn, 572 F. App'x at 175, Petitioner has criticized the cross-examination of only five: (1) Detective Alston; (2) Williams (a co-conspirator named but not charged in the indictment (see Docket Entry 43 at 1-2)); (3) Adams (a self-described (former) drug dealer and girlfriend of one of Petitioner's co-defendants (see Docket Entry 121 at 4-5)); (4) Grier (in her words, "a recovering addict," who "used to prostitute" and then "started selling drugs" (Docket Entry 123 at 4)); and (5) Lindley (previously "a forensic scientist with the North Carolina State Crime Lab" (Docket Entry 203 at 185)). (See Docket Entry 259 at 39-47.)[33]

Courts do not invalidate convictions based on such limited critiques of lengthy trials, because "most attorneys make some mistakes during cross-examination." Hunt v. Nuth, 57 F.3d 1327, 1333 n.4 (4th Cir. 1995); see also Woodruff v. Warden, Perry Corr. Inst., C.A. No. 9:07-2739, 2008 WL 4200291, at *7 (D.S.C. Sept. 8, 2008) (unpublished) ("[R]epresentation by counsel must only be

---

[32](...continued)
Entry 202 at 2-3; Docket Entry 203 at 2-3; Docket Entry 204 at 2-3; Docket Entry 205 at 2-3; Docket Entry 206 at 2.)

[33] Petitioner's evidentiary hearing testimony did not mention impeachment of Adams or Lindley, but did raise the failure of his trial counsel to impeach Williams, Grier, and Detective Alston with pole camera notes. (See Docket Entry 378 at 114, 120-21, 148-50.)

objectively reasonable, not flawless or to the highest degree of skill. Inherent in this standard is the acknowledgment that even the most skillful defense attorneys are bound to make mistakes . . . . If the legal system were to afford prisoners a cause of action merely for demonstrating that, in hindsight, their trial counsel could have done something better, the court system would be choked with habeas petitions . . . ." (internal citation and quotation marks omitted)), appeal dismissed, 326 F. App'x 698 (4th Cir. 2009). Additionally, Ground Six fails not only because of its narrow focus on but five of 43 witnesses, but also because "the trial transcript reveals that [Petitioner's trial] counsel asked multiple probing questions on cross-examination [of those five witnesses]," Yarbrough v. Johnson, 490 F. Supp. 2d 694, 739 (E.D. Va. 2007), aff'd, 520 F.3d 329 (4th Cir. 2008); see also Hicks v. United States, Crim. No. 7:07-1467, Civ. No. 7:11-2718, 2015 WL 12517439, at *3 (D.S.C. Feb. 6, 2015) (unpublished) (rejecting claim for "not adequately challeng[ing] on cross-examination the government witnesses" where "chief government witnesses . . . ha[d] their credibility meaningfully challenged"), appeal dismissed, 619 F. App'x 253 (4th Cir. 2015). (See Docket Entry 120 at 167-93, 290 (cross-examination of Williams by Petitioner's trial counsel); Docket Entry 121 at 65-75 (same as to Adams); Docket Entry 123 at 59-65 (same as to Grier); Docket Entry 203 at 209-14 (same as to Lindley); Docket Entry 206 at 33-42 (same as to Detective Alston).)

For example, Petitioner's trial counsel effectively cross-examined Detective Alston about:

1) the lack of criminal (or even suspicious) activity observed during hundreds of hours of physical surveillance of Petitioner's residence (see Docket Entry 206 at 33-34);

2) Detective Alston's decision not to pursue corroboration for Williams's reports about burying cocaine (see id. at 35-36);

3) Detective Alston's inability to say who deposited the trash at Petitioner's residence before the recovery therefrom of cocaine packaging and a small amount of cocaine base (see id. at 37);[34]

4) the failure to find any evidence of criminal activity during the search of Petitioner's residence (see id. at 38-41); and

5) the paucity of documentation (A) connecting Petitioner to an address where (according to Williams) Jeffries "sold crack cocaine" (Docket Entry 120 at 80; see also id. at 92-93 (describing drug activity at that location)) (see Docket Entry 206 at 41), (B) showing financial support of Grier by Petitioner (see id. at 41-42),[35] and/or (C) supporting prosecution witnesses' accounts of

---

[34] Petitioner's trial counsel also executed a well-choreographed cross-examination of Lindley, which illustrated for the jury the vanishingly tiny quantity of cocaine base reportedly found in that trash-pull. (See Docket Entry 203 at 209-14.)

[35] Grier previously had testified that, "after [she would] sell the package [of cocaine base Petitioner gave her], he paid [her] rent every month." (Docket Entry 123 at 5.)

Petitioner's drug activity, such that the jury "just ha[d] to take th[e cooperating witnesses'] word for it" (see id. at 42).

The record similarly reflects that Petitioner's trial counsel successfully impeached Williams on a number of fronts, such as:

1) his initial statement to law enforcement officers (when caught with drugs and firearms in his residence), which revealed his incentive to incriminate others, i.e., that, as a "three-time loser," he "could take the drugs, but [he] couldn't take the guns" and thus "need[ed] a plan" (Docket Entry 120 at 167);

2) his interest (even prior to meeting with his attorney) in "getting a break" in his case by informing on others (id. at 169);

3) the fact that he spent "several months of confinement" between his arrest and his debriefing with law enforcement officers, allowing him "a considerable amount of time to think about what [he] w[as] going to talk to [them] about," i.e., to make a plan to implicate others to help himself (id. at 174);

4) the strange details of his reported drug-burying practices and the absence of any attempt by law enforcement officers to corroborate those reports (see id. at 175-80);

5) the failure of law enforcement officers to seek verification of his statements through review of his telephone records (see id. at 183-84); and

6) his recognition that federal prosecutors would decide whether or not to file a motion that would permit a reduction in his prison sentence (see id. at 187, 290).

Likewise, Petitioner's trial counsel aggressively questioned Adams and Grier on these important points:

1) the circumstances of Adams's first interview with law enforcement officers that undermined her incrimination of Petitioner, e.g., their identification of Petitioner as a person on whom they wanted her to inform and her fear of arrest if she did not oblige them (see Docket Entry 121 at 67-69);[36]

---

[36] This cross-examination sequence especially stands out:

Q    The[ law enforcement officers] asked you about
     [Petitioner], didn't they?
A    Yes.
. . . .
Q    So they are the ones who had the information, and
     they wanted you to confirm that information, didn't
     they?
A    I guess so.
Q    Okay.  And you were scared, weren't you, Miss
     Adams?
A    Yes, I was scared.
. . . .
Q    And you wanted to do whatever you could to avoid
     what you knew was a serious amount of jail time,
     didn't you?
A    Yes.
. . . .
Q    Okay.  So you wanted to please these [law
     enforcement officers] instead of make them angry at
     you, didn't you?
A    I guess so.

(Docket Entry 121 at 67-68.)

2) the fact that Adams "claimed that [she] dealt drugs with [Petitioner] for years[ and] went to his house more than 50 occasions [but] d[id]n't know what his name [wa]s" (id. at 72);

3) law enforcement officers' disinterest in reviewing Adams's telephone records to validate her statements (see id. at 73-74);

4) Grier's unreliable memory due to her "excessive use of crack cocaine" (Docket Entry 123 at 59); and

5) numerous conflicts between Grier's trial testimony and her prior statements to law enforcement officers (see id. at 60-65).[37]

The foregoing "review of the trial transcript reveals that [Petitioner's trial] counsel did adequately cross-examine the[se] witnesses with respect to [a variety of matters, including lack of corroboration,] . . . receiving sentence reductions [or immunity] in exchange for their testimony against Petitioner," Hicks, 2015 WL 12517439, at *3, "prior and present inconsistencies in the witnesses' statements and accounts, as well as . . . prior involvement in a criminal lifestyle," id., "drug addiction . . ., and [their] vague testimony about the [drug activity they] claimed to have seen," United States v. King, No. 1:08CR41, 2014 WL 1906695, at *12 (W.D. Va. May 13, 2014) (unpublished). Such

---

[37] Notably, through meticulous questioning about these inconsistencies, Petitioner's trial counsel ultimately boxed Grier into characterizing her prior statement to law enforcement officers about the material matter of how she "start[ed] off selling [drugs]" as "a mistake." (Docket Entry 123 at 65.)

"[a]ttack[s on] a witness's credibility and motives are reasonable cross-examination strategies." Guzman-Ortiz v. United States, 849 F.3d 708, 714 (8th Cir. 2017), cert. denied, ___ U.S. ___, 138 S. Ct. 2004 (2018); see also Campbell v. United States, 364 F.3d 727, 735 (6th Cir. 2004) (upholding determination that defense attorney's "focus[ing of] his attack on [cross-examination] on the substantial sentence reduction [the witness] was hoping to receive in exchange for his testimony, and on [the witness's] significant drug related activity" constituted "reasonable trial strategy").

Ground Six thus cannot succeed, for reasons succinctly stated in this Fourth Circuit ruling in an analogous case:

> It is easy for [Petitioner] to argue now that the testimony of [these witnesses] should have been [impeached in other ways] . . . as part of the attack on [their] credibility. But trial strategy decisions are not evaluated through the distorting effects of hindsight. [His trial] counsel's strategy of attacking [these witnesses'] credibility in the manner chosen, which was undeniably focused and aggressive, falls within the wide range of reasonable professional assistance.

Winston v. Kelly, 592 F.3d 535, 544 (4th Cir. 2010) (internal citation and quotation marks omitted); see also Moss v. Olson, 699 F. App'x 477, 487 (6th Cir. 2017) ("Trial counsel made a substantial effort to impeach [this witness] during her cross-examination . . . . The idea that trial counsel may have been more effective in his impeachment had he taken another course is precisely the sort of second-guessing of a tactical judgment that Strickland counsels against." (internal brackets and quotation

marks omitted)), <u>cert. denied</u>, ___ U.S. ___, 138 S. Ct. 674 (2018); <u>Higgs</u>, 711 F. Supp. 2d at 515 ("Given the extraordinarily meaningful concessions counsel did elicit [from this witness], they were not ineffective for their strategic decision not to further cross-examine [this witness] . . . ."); <u>Yaitsky v. United States</u>, No. 2:04CR1097, 2008 WL 3845446, at *16-17 (D.S.C. Aug. 18, 2008) (unpublished) ("Trial [c]ounsel attempted to impeach the various Government witnesses using different methods of impeachment. . . . [The p]etitioner's suggestions of better ways to impeach the Government witnesses do not prove that [t]rial [c]ounsel's actual methods were below an objective standard of reasonableness."), <u>appeal dismissed</u>, 322 F. App'x 347 (4th Cir. 2009).[38]

---

[38] Two other considerations bolster the conclusion that Petitioner cannot satisfy <u>Strickland</u>'s unreasonable performance prong in connection with Ground Six. First, Petitioner's trial counsel reasonably chose to limit his cross-examination of the witnesses at issue because he followed Jeffries's attorney, who already had explored many avenues of impeachment with them. (<u>See</u> Docket Entry 120 at 110-66; Docket Entry 121 at 47-64; Docket Entry 123 at 42-59; Docket Entry 203 at 199-204; Docket Entry 205 at 215-27; Docket Entry 206 at 17-33.) "For each defense lawyer to question [each witness] extensively regarding every aspect of his [or her] background, motivations, and trial testimony would have been redundant and unnecessary. Such strategic decisions of counsel . . . are reasonable and not subject to challenge under <u>Strickland</u>." <u>Lugo v. United States</u>, No. 06CV5400, 2008 WL 5191684, at *13 (E.D.N.Y. Dec. 11, 2008) (unpublished); <u>see also</u> <u>United States v. Neresian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Counsel might very well have felt that there was little need for additional probing by the time it was his turn to cross-examine . . . ."). Second, the cross-examination undertaken by Petitioner's trial counsel harmonized well with the themes he previewed in his opening statement and hammered home in his closing argument, including
(continued...)

Finally, "[n]one of [Petitioner's] suggested [impeachment] errors or omissions are of such a magnitude as to place the conduct [of his trial counsel] outside of prevailing professional norms." Gamble v. Warden Lee Corr. Inst., Civ. No. 3:07-4049, 2009 WL 187816, at *8 (D.S.C. Jan. 26, 2009) (unpublished), recommendation

---

[38](...continued)
branding Williams as the unreliable font of the allegations against Petitioner and highlighting the lack of evidence uncovered by Detective Alston in his years of surveillance and his search of Petitioner's residence. (Compare Docket Entry 120 at 167 (pressing Williams about his "plan" to reduce his prison term), 169 (obtaining Williams's concession that he (not his attorney) "brought up" sentence reduction for informing on others), and Docket Entry 206 at 34 (using extended line of cross-examination of Detective Alston to emphasize that protracted observation of Petitioner's residence produced no evidence of illegality), 40 (demonstrating through questioning of Detective Alston that search of Petitioner's residence did not reveal any sign of drug activity), with Docket Entry 219 at 51 (forecasting, in opening statement, that "[t]he conspiracy [charged against Petitioner], the evidence will show, began in the fertile mind of [] Williams . . . after he was busted," that "nothing was said [about Petitioner conspiring with his co-defendants] until . . . Williams [wa]s arrested," and that, "while being interviewed at the jail, [] Williams spontaneously uttered to the detectives, 'I need a plan'"), and Docket Entry 221 at 32 (arguing that testimony of Williams and other cooperators "w[as] motivated by nothing more than self-preservation"), 33-36 ("[T]he image that I want to talk with you about is the remarkable . . . surveillance and search of [Petitioner's residence] . . . . [F]or four years, [Detective] Alston watched that house . . . . [A]fter four years, [he] d[id]n't have anything of note to offer to a jury . . . . When [he] finally g[o]t around to a search of [Petitioner's] house . . ., what happens? . . . There was no evidence [of any drug crime]."). "Considering [that] opening statement, cross-examination of [witnesses], and closing argument, it is clear that [P]etitioner's after-the-fact attempt to establish that [his] trial counsel's questions [failed to suffice] . . . represents nothing more than 'Monday morning quarterbacking' which warrants no additional analysis . . . ." Yarbrough, 490 F. Supp. 2d at 739.

<u>adopted</u>, <u>id.</u> at *2, <u>appeal dismissed</u>, 406 F. App'x 721 (4th Cir. 2010).  As to Detective Alston, Petitioner has argued that his trial counsel performed inadequately, because:

1) at trial, Detective Alston testified that, during a trash-pull at Petitioner's residence in May 2007, Detective Alston "found a 'white-powder' substance separate in the trash bag separate [sic] from the 2 [k]ilo [w]rappers" (Docket Entry 259 at 39), but Petitioner's trial counsel failed to cross-examine Detective Alston about a report in which he "stated that he got the 'white powder' substance out of the 2 [k]ilo [w]rappers" (<u>id.</u> at 40);[39]

_____

[39] Petitioner's evidentiary hearing testimony appears to contradict his Memorandum of Law's account of that unidentified report.  (<u>See</u> Docket Entry 378 at 118 (indicating that Petitioner's trial counsel "possess[ed] the documentation to show that . . . [Detective Alston's report] stated he got . . . the white powder substance from <u>outside</u> of the kilo wrappers" (emphasis added)).)  At other points in the hearing, Petitioner testified about other matters pertaining to the cocaine packaging recovered from the trash-pull; however, to the extent that testimony conveys anything comprehensible, it diverges materially from the factual framework laid out in the Memorandum of Law for this aspect of Ground Six.  (<u>Compare</u> Docket Entry 259 at 39-40 (discussing alleged inadequate impeachment of Detective Alston regarding where he discovered "'white powder' substance" in relation to cocaine packaging), <u>with</u> Docket Entry 378 at 151-52 (recording testimony from Petitioner about "kilo wrapper issue").)  "[A]n evidentiary hearing is not a penalty-free second-chance platform for a § 2255 petitioner to raise new claims that he did not think to bring earlier . . . ."  <u>United States v. Hale</u>, Crim. No. 07-385, Civ. No. 09-494, 2010 WL 2105141, at *9 (S.D. Ala. May 24, 2010) (unpublished).  The Court therefore should not allow Petitioner to use his evidentiary hearing testimony to "transform his [Section] 2255 [M]otion into a moving target."  <u>Id.</u> at *8 n.13.  In any event, any such new impeachment-related, ineffective assistance sub-claim falters not only for all of the same reasons that preclude relief on Ground Six

(continued...)

64

2) although, "[i]n Det[ective] Alston's trial testimony, he stated that while conducting th[at] trash pull . . . he discovered three pieces of mailed [sic] addressed to [Petitioner, his wife], and [] Jeffries" (id.), Petitioner's trial counsel neglected to impeach Detective Alston with documents "stat[ing] that he found one piece of mail addressed to [Petitioner's wife and] . . . then at another point stat[ing] that 'several pieces of mail addressed only to [Petitioner and his wife were found]" (id. (emphasis added) (unmatched quotation mark in original) (citing Incident/ Investigation Report (Docket Entry 259-1 at 8-9) and Case Supplemental Report (id. at 10) and purporting to quote Reporting Officer Narrative (id. at 11))); and

3) "Det[ective] Alston stated in his trial testimony that he conducted only 'physical surveillance' at [Petitioner's residence]" (Docket Entry 259 at 41), which should have prompted his trial counsel to confront Detective Alston about his utilization of "a pole camera that he installed at the residential location" (id.).

These three proposed bases for cross-examination did not offer impeachment so valuable that their omission rendered the performance of Petitioner's trial counsel professionally negligent.

---

[39](...continued)
more generally (detailed above), but also because it otherwise remains "vague, conclusory, [and] speculative," Cabrera v. United States, Nos. 1:09CR323-1, 1:12CV695, 2014 WL 6386902, at *9 (M.D.N.C. Nov. 14, 2014) (unpublished) (Osteen, Jr., C.J.).

Regarding the first, Detective Alston's trial testimony and reports (in the record) about the trash-pull do not differ markedly (much less in a manner that exculpates Petitioner).  (Compare Docket Entry 205 at 75-76 ("I found a black bag that was in the trash bag; and inside that black bag, I located a rectangular packaging . . . .  There was [sic] two of them. . . .  This particular packaging is how [cocaine] kilograms are wrapped. . . .  Also, in that bag, I located a white powder substance . . . ."), with Docket Entry 259-1 at 10 ("In one of the trash bags I located a small black plastic bag.  In the black plastic bag were two kilogram (kilo) wrappers that had a small amount of white powder in each one of them." (standard capitalization applied)), 11 ("I located two kilogram (kilo) wrappers with a white powder residue on both of them.").)  Moreover, questioning Detective Alston about whether he gathered the white powder substance from the kilo wrappers (as his reports might suggest) or from the small plastic bag that contained those wrappers (as he testified) simply "would have given [him] the opportunity to explain away a relatively minor inconsistency," Curry v. United States, Civ. No. 11-5800, 2015 WL 733274, at *17 (D.N.J. Feb. 20, 2015) (unpublished).[40]

_____

[40] The same basic rationale defeats Petitioner's criticism of his trial counsel's failure to cross-examine Lindley about "her trial testimony that she was given Exhibit 99 (2 Kilo wrappers containing residue and a plastic bag containing off-white hard material), on March 26, 2007" (Docket Entry 259 at 46-47 (unmatched
(continued...)

Ultimately, as documented above, "the record shows that [Petitioner's trial] counsel extensively cross-examined [Detective Alston]. In light of [that] vigorous cross-examination, the fact that [Petitioner's trial] counsel failed to address a minor discrepancy between [Detective Alston's] testimony and [his written reports] . . . was not ineffective assistance." <u>Jones v. United States</u>, Nos. 5:04CR324, 5:08CV582, 2010 WL 2612310, at *3 (E.D.N.C. June 25, 2010) (unpublished), <u>appeal dismissed</u>, 416 F. App'x 318 (4th Cir. 2011); <u>see also</u> <u>Campbell</u>, 364 F.3d at 735 (affirming rejection of inadequate impeachment claim where "inconsistencies identified by [the] defendant were relatively minor").

---

[40](...continued)
quotation mark omitted) (citing Docket Entry 203 at 207)), using "documents that stated that the evidence comprising of Exhibit 99 derived from an allegedly [sic] trash pull that was conducted by Det[ective] Alston on May 24, 2007, which is after March 26, 2007" (Docket Entry 259 at 47 (citing Docket Entry 259-1 at 8-11, 13-14); <u>see also</u> Docket Entry 259 at 47 ("Also [Petitioner's trial] counsel had in this [sic] possession a Laboratory Report prepared by [] Lindley herself that stated that the evidence was not submitted to her until August 2, 2007 . . . ." (citing Docket Entry 259-1 at 12))). The United States correctly has argued that "[t]his misstatement could have easily been corrected." (Docket Entry 306 at 29.) Indeed, "[h]ad [Petitioner's trial] counsel cross-examined [Lindley] regarding the date [s]he allegedly [received this evidence, she] could have testified that [s]he was confused with the date and [received it] on another date." <u>Leigh v. United States</u>, Nos. 3:00CR57, 3:04CV22, 2005 WL 1334568, at *4 (N.D.W. Va. June 3, 2005) (unpublished), <u>recommendation adopted</u>, 2005 WL 8141650 (N.D.W. Va. Dec. 27, 2005) (unpublished), <u>appeal dismissed</u>, 241 F. App'x 954 (4th Cir. 2007). Petitioner's trial counsel therefore "was not ineffective for failing to question [Lindley] on this point and highlight again that her test revealed the presence of a controlled substance." (Docket Entry 306 at 29.)

The second alleged area of inadequate cross-examination of Detective Alston, concerning reputed conflicts between his trial testimony and prior description of documents recovered during the trash pull in May 2007, similarly falls far short of establishing unreasonable representation. In that regard, contrary to Petitioner's assertion that Detective Alston's Incident/ Investigation Report and Case Supplemental Report "state[] that he found <u>one piece of mail</u> addressed to [Petitioner's wife]" (Docket Entry 259 at 40 (emphasis added) (citing Docket Entry 259-1 at 8-10)), the Incident/Investigation Report actually just generically lists "paperwork" (Docket Entry 259-1 at 8 (all-caps font omitted)) and the Case Supplemental Report merely references "paperwork that had the name [of Petitioner's wife] on it" (without stating that the seized paperwork consisted <u>solely</u> of a lone letter addressed to her) (<u>id.</u> at 10). Even more significantly, although Petitioner used a quotation mark to attribute to Detective Alston's Reporting Officer Narrative an explicit statement that he found "'several pieces of mail addressed <u>only</u> to [Petitioner and his wife]" (Docket Entry 259 at 40 (emphasis added) (unmatched quotation mark in original) (purporting to quote Docket Entry 259-1 at 11)), the Reporting Officer Narrative contains neither any such quotation nor any statement expressing that "only" the names of Petitioner and his wife appear on documents recovered from the trash pull (<u>see</u> Docket Entry 259-1 at 11). Because Detective Alston's reports do

not contain the language Petitioner ascribes to them, a competent cross-examiner would not necessarily have used those reports in the fashion Petitioner has suggested to challenge Detective Alston's testimony that "paperwork that was located in . . . the trash pull" (Docket Entry 205 at 89) included "a receipt for an airline ticket" with "the passenger listed" as Petitioner (id.), "another airline ticket" with his wife's "name[] listed" (id.), and "[a] copy of an insurance statement" bearing Jeffries's name and Petitioner's address (id.). See United States v. Bryant, No. 3:04CR47, 2013 WL 393334, at *14 (W.D. Va. Jan. 31, 2013) (unpublished) ("Given their lack of value as impeachment documents failing to impeach [the] witness with the[m] was within the range of reasonable attorney conduct."), appeal dismissed, 520 F. App'x 226 (4th Cir. 2013).

The third cross-examination topic Petitioner faulted his trial counsel for failing to pursue with Detective Alston also relies on an errant premise. Specifically, Petitioner has asserted that "Det[ective] Alston stated in his trial testimony that he conducted only 'physical surveillance' at [Petitioner's residence]" (Docket Entry 259 at 41 (emphasis added)), when, in fact, he additionally used "a pole camera that he installed at th[at] residential location" (id.). However, the trial transcript confirms that, although – in describing activity at Petitioner's residence – Detective Alston made clear that his description came from his "physical surveillance" (Docket Entry 205 at 71, 94), at no point

in his testimony about such matters did he state that he only engaged in physical surveillance (see id. at 71-73, 90, 93-97, 213-14). In so doing, Detective Alston carefully honored the evidentiary restriction the United States self-imposed at a pre-trial hearing to address the fact that, before the federal grand jury indicted Petitioner, "the actual video from th[e] pole camera was videotaped over." (Docket Entry 196 at 14-15; see also id. at 15-16 (agreeing that, because of loss of video recordings, prosecution case-in-chief would rely exclusively on "actual direct surveillance from the officers without any aid of any pole camera," but reserving right, "if a door [wa]s open[ed by a defendant, to] ask[] questions" about pole camera notes).)

That agreement by the United States to refrain from making any initial reference to the pole camera (and related notes) gave Petitioner and his co-defendants a valuable opportunity upon which they eagerly capitalized. In particular, Jeffries's attorney (the first defense counsel conducting cross-examination) forced Detective Alston to concede that, while performing physical surveillance, he did not make notes or take photographs to document "who came and went from the residence," "when people arrived or when they departed," or "what vehicles they drove." (Docket Entry 206 at 26.) That concession then allowed Petitioner's trial counsel to include within his closing argument the following:

[F]or four years, [Detective] Alston watched that house
and [Petitioner].  And you know what [Detective Alston]
said to you folks about taking notes?  He said he didn't
take any notes.  Can you believe that?  For four years
you sit in front of a man's house day and night, and you
don't take any notes about what took place.

. . . [I]s it not so clear that if, after four years, you
don't have anything of note to offer to a jury, that the
man simply is not guilty of dealing in drugs?  Don't you
think that maybe a few times there would have been an
unusual transaction, somebody coming to the front door,
knock, knock, knock, looking around surreptitiously.
Here's the package. . . .  Not a single time.

I would say to you as juror[s] you should expect more
from the United States Government.  If they want to put
somebody in jail and take their freedom away for years,
I would expect more in terms of quality evidence than
what you saw.

(Docket Entry 221 at 34-35.)

Petitioner would have lost that potent line of argument, if
his trial counsel – while questioning Detective Alston (or
Williams, Adams, or Grier) – had brought up the pole camera and the
notes of its recordings.  In other words, Petitioner's trial
counsel faced a choice:  (A) reveal the existence of the pole
camera notes and forfeit the critique of the prosecution evidence
their absence allowed; or (B) refrain from using the pole camera
notes and discredit Detective Alston's investigation as shoddy and
insufficient to prove Petitioner's guilt.  Petitioner's trial
counsel chose the latter course and that "choice to focus on some
issues to the exclusion of others carries with it a strong
presumption that [he] did so for tactical reasons," Guzman-Ortiz,

71

849 F.3d at 714 (internal brackets and quotation marks omitted).[41] Such "trial strategy decisions are not evaluated through the distorting effects of hindsight. [Trial] counsel's strategy of attacking [the prosecution evidence] in the manner chosen, which was undeniably focused and aggressive, falls within the wide range of reasonable professional assistance." Winston, 592 F.3d at 544 (internal citation and quotation marks omitted).[42]

In light of all these considerations, the Court should deny Ground Six.

Ground Seven:  Ineffective Assistance due to Medication

For its seventh ground, the Section 2255 Motion contends that Petitioner received ineffective assistance when his trial counsel "[f]ail[ed] to [i]nform the Court that [h]e was on [m]edication and it was affecting [his s]kills as an [a]ttorney."  (Docket Entry

_____

[41] Petitioner's evidentiary hearing testimony validates that strong presumption.  (See Docket Entry 378 at 174 ("[My trial counsel] told me . . . that the Government will state it cannot use [the pole camera] in [its case-in-]chief.  Then when that was stated, he said, 'Good.  Well if you're not going to say nothing [sic] about it, I'm not going to say nothing [sic] about it.'").)

[42] Petitioner's attacks on the cross-examination of Williams, Adams, and Grier also concentrate on the absence of attempted impeachment with the pole camera notes.  (See Docket Entry 259 at 42-46; Docket Entry 378 at 114, 120-21, 148-50.)  Those sub-claims fail for the same reasons (discussed above) as does the sub-claim regarding the election by Petitioner's trial counsel to forego such questioning of Detective Alston.  In addition, as the United States has observed, "Williams, [] Adams and [] Grier would have had no knowledge of the pole camera notes and could not have been properly cross-examined on something that was not within their knowledge." (Docket Entry 306 at 29 (citing Fed. R. Evid. 602).)

254, ¶ 12(Ground Seven); <u>see also</u> Docket Entry 258, ¶ 12(Ground Seven) (labeling claim as "Ineffective Assistance of Counsel for Failing to Inform the Court that He Was Ill and that Medication He Was Taking Was Affecting His Abilities to Defend [] Petitioner").)

To support that claim, the Section 2255 Motion states:

> [Petitioner's trial c]ounsel informed Petitioner's wife that he was having trouble remembering things during the criminal proceedings because of the medication he was taking. [He] had a duty to inform the [C]ourt whether a medication was effecting [sic] his skills at trial, being that this could reasonable [sic] effect [sic] the defense that he was arguing and thereby effect [sic] the out [sic] of the trial.

(Docket Entry 254, ¶ 12(Ground Seven); <u>see also</u> Docket Entry 259 at 52 ("[Petitioner's trial counsel stated that] . . . it was his medication that made him forget things. Also, at one point, [he] told Petitioner's sister that he was not sure he would live through the trial." (internal citation omitted) (citing affidavits of Petitioner's wife (Docket Entry 259-1 at 5-6) and sister (<u>id.</u> at 60))); Docket Entry 259-1 at 60 ("After watching [Petitioner's trial counsel] sleeping during trial, the judge granted a break. . . . I asked [Petitioner's trial counsel] if he was okay. He turned to me and told me no, he's a diabetic and his sugar level is goioing [sic] down and he's under doctor's care.").) This ineffectiveness claim fails on the merits.

As an initial matter, because Petitioner's wife and sister did not testify at the evidentiary hearing (<u>see</u> Docket Entry 378 at 2

(listing Petitioner's witnesses); Docket Entry 379 at 2 (listing witnesses for United States); see also Docket Entry 378 at 160 (questioning propriety of "considering affidavits from individuals who have had the opportunity to appear at a hearing and . . . have not appeared"); Docket Entry 383 at 3-13 (arguing for relief on Ground Seven without citing affidavits of Petitioner's wife and sister)), their affidavits cannot sustain Ground Seven:

> Although [those] affidavit[s had to] be taken as true for purposes of determining whether a hearing on [the Section 2255 M]otion [wa]s required, unless [the affiants were] available to testify in person at the hearing, relief cannot be granted [based on their affidavits].  Once [an] affidavit is deprived of the assumption of truth . . ., as it would be at a hearing, it has no credible weight.  . . .  [The affiants were] not subject to cross-examination.  The[ir] affidavit[s are] thus a legally insufficient basis for collateral relief . . . .

Moreno-Ortiz v. United States, 983 F.2d 15, 17 (2d Cir. 1993) (internal citation omitted).[43]

Nor does the record made at the evidentiary hearing support a finding that Petitioner's trial counsel suffered from a medical or medication-related impairment that hindered his representation of Petitioner.  In that regard, Paralegal Crowder – who first "met [Petitioner's trial counsel] in 1997 when [she] went to work for

---

[43] Any factual matter set out in the unsworn Memorandum of Law likewise "cannot constitute a basis for habeas relief. . . .  Facts alluded to in an unsworn memorandum will not suffice."  United States v. Rhodes, No. 3:08CR82, 2013 WL 150335, at *3 (E.D. Va. Jan. 14, 2013) (unpublished), aff'd in part and appeal dismissed in part, 531 F. App'x 279 (4th Cir. 2013).

him" (Docket Entry 378 at 32) – credibly testified that, notwithstanding "a heart condition[ and] neuropathy in his legs" (id. at 40; see also id. at 40-41 (describing that "neuropathy" as instances when, his legs "would turn to stone and it was like he couldn't move [them]," testifying that, "to [her] knowledge, he was never diagnosed as being a diabetic," and affirming that he suffered from "[n]o illnesses" in 2012)), he "could file motions when he needed," "could research prior to filing motions," and "perform[ed] with regard to [this] case as strong[ly] as h[e] perform[ed] in other defendants' cases" (id. at 61; see also id. (indicating that, despite experiencing two heart attacks before 1997, for subsequent "17 years [he] was able to perform competently as an attorney")).  Paralegal Crowder gave further credible testimony that she did not "ever see any lack of effort or any lack of capability or anything with regard to [Petitioner's trial counsel's defense of this] case." (Id.)

Attorney Johnson (who appeared on behalf of one of Petitioner's co-defendants (see id. at 7)) similarly testified in credible fashion that, during this case, Petitioner's trial counsel "complained about his foot bothering him" (id. at 24), but nonetheless "knew what he was doing" (id. at 17), "had a grasp of the facts in this case" (id.), possessed "a good understanding of the discovery in this case" (id.), "did what he could do to potentially poke holes in th[e prosecution's strong] case" (id. at

18), maintained "consisten[cy] in his trial strategy" (id.), remained "engaged when he had to question witnesses" (id.), "conducted himself as [one] would have expected a defense attorney to have conducted himself" (id. at 22), "wasn't floundering in memory or ability" (id.), "ask[ed] appropriate questions" (id.), and "cross-examin[ed] on matters that needed [it]" (id. at 23). At the evidentiary hearing, Andy Patrick Roberts (who represented another of Petitioner's co-defendants (see Docket Entry 379 at 5-6)) also credibly testified that, during the trial, Petitioner's trial counsel "appeared fine. There was nothing noticeable to [Attorney Roberts]." (Id. at 8-9; see also id. at 13 ("Q. Did he appear to be physically ill at any point during the trial? A. Not to me.").) Additionally, according to Attorney Roberts, Petitioner's trial counsel's "questions appeared to be clear, well though out, direct, [and] relevant." (Id. at 9; see also id. at 10-11 (denying that "there were questions or issues that [Petitioner's trial counsel] should be objecting to that he did not object to," that he "ha[d] a tendency to repeat questions that [Attorney Roberts had] asked," and/or that any "indications [existed] that [Petitioner's trial counsel] was not alert enough to be able to comprehend what was going on in the courtroom").) Simply stated, Attorney Roberts "never had any thought at the time when [h]e tried the case that there was any sort of impairment of any sort on [Petitioner's trial counsel's] part." (Id. at 12.)

In general accord with the foregoing accounts, Christopher Beechler (the attorney for Petitioner's remaining co-defendant (see id. at 19-20)) credibly testified that, although he "would not describe [Petitioner's trial counsel] as being in . . . the best of physical health" (id. at 23), in that "he sort of walked slowly [due] perhaps just [to] normal wear and tear" (id.; see also id. ("He didn't need any assistance. But . . . he just didn't appear to be in the best shape, whether it was fitness or his weight or anything else.")), Attorney Beechler did not "at any time see any lapse of [Petitioner's trial counsel's] ability to ask questions or to pay attention to the trial" (id.). Furthermore, Attorney Beechler never "thought that [Petitioner's trial counsel] failed to competently address a witness or make a motion or respond to an argument[ or] an objection." (Id. at 24.) In fact, when asked "did [he] ever see any level of failure" (id. (emphasis added)), Attorney Beechler answered that he "did not" (id. at 25).[44]

---

[44] The credibility assigned to the testimony quoted above from Paralegal Crowder and the attorneys for Petitioner's co-defendants rests in part on those witnesses' "matter-of-fact, not adversarial, . . . tone," Diaz, 2014 WL 7384974, at *5, and the absence of "evidence that [they] had any incentive to lie," Solomon, 24 F. App'x at 151 n.1. In addition, the other two witnesses at the evidentiary hearing, Petitioner and Jeffries (see Docket Entry 378 at 2 (identifying Petitioner's witnesses); Docket Entry 379 at 2 (identifying witnesses for United States)), did not offer any meaningful contradictory evidence that, while defending this case, Petitioner's trial counsel suffered from a disabling medical condition (see Docket Entry 378 at 70-216). Indeed, as to specific observations regarding the health of Petitioner's trial counsel,
(continued...)

Lastly (as concerns the health of Petitioner's trial counsel), the parties have stipulated that:

1) he "<u>was prescribed</u> the following prescription medicines during the time that [Petitioner's] trial was being conducted: Viagra, Xanax, Lyrica and Prilosec" (Docket Entry 382 at 1 (emphasis added));[45]

---

[44](...continued)
Jeffries mentioned only that Petitioner's trial counsel had "kind of like a hacking cough." (<u>Id.</u> at 72; <u>see also</u> <u>id.</u> at 73 ("[Jeffries] didn't know if [Petitioner's trial counsel] was really sick, . . . but [Jeffries] could tell [Petitioner's trial counsel] wasn't in the best of health.").) Petitioner, in turn, referenced only one occasion when his trial counsel "was coughing for a few minutes and the judge asked him, 'Are you okay?'" (<u>Id.</u> at 126; <u>see also</u> <u>id.</u> at 199 ("[H]e was coughing. I didn't know at the time . . . he was sick . . . .").) Attorney Johnson also allowed that Petitioner's trial counsel "may have coughed" (<u>id.</u> at 12) and Attorney Roberts "recall[ed] him coughing from time to time" (Docket Entry 379 at 18); however, as Attorney Beechler noted, one hardly could "imagine that [the attorneys in the case] all didn't cough at some point during trial" (<u>id.</u> at 24; <u>see also</u> Docket Entry 378 at 12 (Attorney Johnson: "[I]f this case was in February, I may have been coughing. . . . [T]he weather was cold. . . . [I]t was a long case; so it kind of . . . wears on you.")). Moreover, as Petitioner acknowledged, "just because somebody is coughing doesn't mean that they have some disease . . . ." (Docket Entry 378 at 197; <u>see also</u> <u>id.</u> ("Q. In fact, if you swallow water wrong, you might cough; isn't that correct? A. Yes, ma'am.")). Consistent with that acknowledgment, Petitioner's Reply concedes he cannot secure relief on Ground Seven due to his trial counsel "coughing during trial." (Docket Entry 319 at 11.)

[45] According to Paralegal Crowder, Petitioner's trial counsel "took . . . Lyrica for his legs" and Prilosec "for his acid reflux." (Docket Entry 378 at 41; <u>see also</u> <u>id.</u> at 42 ("I know the stuff for his legs, the neuropathy, he took the Lyrica and the stuff for his acid reflux. But the other stuff -- the Xanax he didn't take regularly. He didn't take it. The Viagra, I don't know. It wasn't my business.").)

2) those "drugs, either by themselves or in combination with each other, or with other drugs, <u>can</u> cause drowsiness and/or confusion, which <u>can be mild</u>, severe <u>or non-existent</u> depending on several factors including but not limited to dosage, age, body weight, metabolism and natural tolerance to the medications" (<u>id.</u> (emphasis added)); and

3) "when [Petitioner's] trial was being conducted, [his trial counsel] took several medications on a daily basis, but <u>there is no evidence to show what drugs he may or may not have been taking on the days that the trial was conducted</u> in this matter" (<u>id.</u> (emphasis added)).

The foregoing evidence and stipulations confirm that, although Petitioner's trial counsel (like many, if not most, senior lawyers) dealt with some ailments and held prescriptions for medications to treat those ailments, the record does <u>not</u> support a finding that, while handling this case, he endured any disabling medical condition, took any particular medication at any particular time, or experienced any side effects from any medication he took. In the (adapted) words of a court confronted with a similar scenario:

> [N]either [Petitioner] nor anyone else can prove what effects, if any, [any medical condition or medication] had on [trial counsel's] memory and cognitive ability at the time he represented [Petitioner] at trial. Therefore, even if [trial counsel] had been [under a doctor's care and taking medication] at the time of [the] trial, this alone is not sufficient for a per se reversal of [Petitioner's] conviction by a jury. . . . [T]he best indicator of [trial counsel's] ability, or lack thereof,

> to represent [Petitioner] at trial was [trial counsel's]
> actual performance. . . . Were the rule otherwise, trial
> judges might be compelled to deny defendants' choice of
> counsel, when they hired old lions of the bar, often to
> defendants' detriment.

Dows v. Wood, 211 F.3d 480, 485-86 (9th Cir. 2000); see also id. at 485 (rejecting "argu[ment] that, because [defense attorney] was diagnosed with, and in the advanced stages of, Alzheimer's disease only eighteen months after [the petitioner's] rape trial, and because the doctors concluded that the disease probably was present in earlier stages during [that] trial, [the court] should . . . infer prejudice"); Berry v. King, 765 F.2d 451, 454 (5th Cir. 1985) ("[U]nder *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim. The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant. We therefore concentrate on [the petitioner's] specific allegations of deficient performance and prejudice." (emphasis in original)).

In this case, Petitioner has "ma[d]e no adequate allegation of specific prejudice resulting from [his trial counsel's] supposed illness." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978). As the testimony of Paralegal Crowder and the attorneys for Petitioner's co-defendants (detailed above) shows, Petitioner's trial counsel met his professional obligations in this case; moreover, in connection with Grounds One through Six:

> Each instance of alleged ineffectiveness has been
> reviewed . . . and no failure in performance has been
> found.  The record fails to support any claim that [the]
> handling of pretrial . . . or [trial] issues was affected
> by [the health of Petitioner's trial counsel].  The fact
> alone that [he] subsequently [died] . . . cannot be used
> as a post hoc rationalization intended to defeat
> [Petitioner's conviction] . . . .

Frye v. Lee, 89 F. Supp. 2d 693, 709 (W.D.N.C.) (internal citations

and quotation marks omitted), appeal dismissed, 235 F.3d 897 (4th

Cir. 2000).

At oral argument, to avoid denial of Ground Seven for want of

evidence of prejudice attributable to his trial counsel's alleged

ill-health, Petitioner focused on evidentiary hearing testimony

that his trial counsel "did fall asleep at some point during the

trial."  (Docket Entry 383 at 4; see also id. at 8 (acknowledging

that, "in the regular *Strickland* two-prong system, without [his

trial counsel] being asleep . . ., [Petitioner] ha[s] to show

prejudice," but suggesting that he need not make such showing to

prevail on Ground Seven, in light of evidence of his trial counsel

sleeping).)  Petitioner then sought to pair that testimony with the

ruling in United States v. Ragin, 820 F.3d 609 (4th Cir. 2016),

which he described as "tak[ing] out prejudice [from the analysis of

an ineffective assistance claim] if there is a substantial or [sic]

portion of the trial when an attorney was asleep."  (Docket Entry

383 at 11.)  In that decision, the Fourth Circuit did hold that,

"when counsel for a criminal defendant sleeps through a substantial

portion of the trial, such conduct compromises the reliability of the trial, and thus no separate showing of prejudice is necessary." Ragin, 820 F.3d at 612 (emphasis added); accord id. at 619. "Whether a lawyer slept for a substantial portion of the trial should be determined on a case-by-case basis, considering, but not limited to, the length of time counsel slept, the proportion of the trial missed, and the significance of the portion counsel slept through." Id. at 622 n.11. Because the credible evidence regarding such considerations does not prove that Petitioner's trial counsel "slept for a substantial portion of the trial," id., Ragin's presumption of prejudice does not apply here.

As to "the length of time [Petitioner's trial] counsel slept[ and] proportion of the trial [he] missed" id., the record credibly establishes only one occasion – lasting a mere minute or less, during testimony by one witness in a multi-week, 43-witness trial – when Petitioner's trial counsel "had fallen asleep" (Docket Entry 378 at 38); more specifically, Paralegal Crowder testified that:

> [She] was sitting behind [Petitioner's trial counsel] . . . . [She] saw [his] head kind of lean forward; and when [she] seen [sic] that, [she] immediately kicked the back of his chair with [her] right leg. [Petitioner] took his right knee[ and] bumped [his trial counsel's] left knee. In 30 seconds he popped back up. . . . [I]t all took 30 seconds maybe and he started coughing and that was, in [her] opinion, his way of playing it off. No one else in that courtroom besides [Petitioner] and [Paralegal Crowder] knew that that's what happened.
>
> . . . .

[Now-Chief Judge Schroeder] did look at [Petitioner's trial counsel] and say . . . 'Are you all right?' But it was due to the coughing, in [Paralegal Crowder's] opinion.

. . . .

[She did not] think [a recess was taken]. . . . [She] think[s] the[ trial] kept moving along.

(Id. at 38-39; see also id. at 39 (affirming she "only saw that the one time"), 47 (reiterating "that he was asleep for no longer than . . . 30 seconds maybe"), 66 (acknowledging her affidavit filed with Response by United States "says something about [him] f[alling] asleep for approximately one minute," but insisting "[i]t was less than a minute" (referencing Docket Entry 306-3 at 4)).)

Turning to other witnesses at the evidentiary hearing, Attorneys Roberts and Beechler, who both sat near Petitioner's trial counsel at trial (see Docket Entry 379 at 8 ("[Attorney Roberts] was at the end of the defense table. To [his] left was [] Jeffries, to [Jeffries's] left was [Petitioner's trial counsel] . . . ."), 21 (recording Attorney Beechler's description of his position four seats from Petitioner's trial counsel around defense table's "L configuration")), provided no testimony that could support a finding that Petitioner's trial counsel slept at all during (let alone for a substantial portion of) the trial. (See id. at 11-12 ("Q. At any point during the trial did you [Attorney Roberts] see [Petitioner's trial counsel] close his eyes or nod off? A. . . . [T]here was one instance after a lunch break that

I recall him sitting in his chair and I thought he was asleep.
. . . . It wasn't during trial proper . . . ."), 15 ("[Attorney
Roberts's] practice was typically to try to come in about 10
minutes early . . . as soon as they opened [the courtroom] . . . .
[He] recall[ed once] walking in [when he] believe[d Petitioner's
trial counsel] was asleep. . . . [Petitioner] was not in the
courtroom at the moment and . . . the judge had not taken the bench
at that point."), 24 ("Q. Did you [Attorney Beechler] ever see any
signs of [Petitioner's trial counsel] falling asleep? A. I do not
remember seeing that.").)[46]

---

[46] Jeffries testified that he once "heard [Petitioner's trial
counsel] snore . . . . [Jeffries] looked at [Attorney
Roberts]. . . . [They] both had like a facial expression kind of
like 'Wow.'" (Docket Entry 378 at 72; see also id. at 94 ("Q.
. . . [Attorney] Roberts was aware of [such snoring] when it
happened? A. Yes.").) Attorney Roberts, however, denied
exchanging "any kind of gesture . . . with [Jeffries] . . .
[r]egarding [Petitioner's trial counsel] being asleep." (Docket
Entry 379 at 16.) The Court should discredit Jeffries's account
(as to whether he and/or Attorney Roberts heard Petitioner's trial
counsel snoring), due to: (1) Jeffries's bias (see Docket Entry
378 at 85-86 (describing Petitioner as "friend" and giving evasive
answers, inconsistent with prior testimony, about Petitioner's drug
activity), 89-90 (acknowledging friendship with Petitioner since
2003 and regular communication with him via prison "[e]-mail
system")); (2) Jeffries's pattern of false testimony (compare id.
at 78 ("Q. And you remember thinking that success in that trial
was unlikely, right? A. No, . . . I never said that."), with id.
at 82 (confirming that, in prior testimony, he "'[a]nswer[ed]: I
didn't think we would succeed,'" when asked about pre-trial opinion
of "'likelihood of success at trial'"); see also id. at 77 ("I was
never in a conspiracy.")); (3) Attorney Roberts's "matter-of-fact,
not adversarial, . . . tone," Diaz, 2014 WL 7384974, at *5; and
(4) the absence of "evidence that [Attorney Roberts] had any
incentive to lie," Solomon, 24 F. App'x at 151 n.1.

The remaining defense counsel from Petitioner's trial, Attorney Johnson, testified that he "didn't think [Petitioner's trial counsel] fell asleep. [Attorney Johnson] d[id]n't think [Petitioner's trial counsel] missed anything." (Docket Entry 378 at 28; see also id. at 11 ("[Attorney Johnson] didn't hear [Petitioner's trial counsel] snoring."), 16 (same).)[47]

---

[47] At earlier points in his testimony, Attorney Johnson reported that Petitioner's trial counsel "nod[ded] off a couple of times" (Docket Entry 378 at 10 (emphasis added)), that he "may have nodded off" (id. (emphasis added)), and that "it may have happened as many as three or four times" (id. at 11 (emphasis added); see also id. (qualifying such testimony even more by stating "I'm not sure")). For several reasons, those statements do not show that Petitioner's trial counsel fell asleep in trial (particularly not for any substantial portion). First, those statements "are, for the most part, equivocal. They use words such as . . . 'may' . . . . The [C]ourt must assume that [Attorney Johnson] used [such] equivocal word[ing] for a reason, namely because there w[ere] two] possibilit[ies] . . . ." Lemelson Med., Educ. & Research Found., Ltd. P'ship v. Intel Corp., No. 2:98CV1413, 2006 WL 8440838, at *5 (D. Ariz. Aug. 8, 2006) (unpublished); see also Knutson Towboat Co. & Saif Corp. v. Wakeley, 660 F. App'x 487, 489 (9th Cir. 2016) (Burns, J., concurring in the result) ("'May' is a wonderfully equivocal word. It implies that something could be true – or not. Its meaning is neither concrete nor definitive, so saying something 'may be so' actually resolves nothing."). In other words, based on this testimony, Petitioner's trial counsel may or may not have "nodded off." Further, Attorney Johnson's testimony that he "didn't think [Petitioner's trial counsel] fell asleep" (Docket Entry 378 at 28) makes clear that Attorney Johnson did not equate any "nodding off" (that may or may not have occurred) with Petitioner's trial counsel actually sleeping; rather, Attorney Johnson used that term to refer to "clos[ing] your eyes" (id. at 15, 23) or similar signs of "fatigue" (id. at 23) that do not amount to sleeping, both in (A) Attorney Johnson's view (see id. at 15 ("Q. Did you [Attorney Johnson] ever close your eyes during that trial? A. I may have. This was a long case. . . . Q. [Attorney Johnson], I'm just asking whether you closed your eyes during that trial. A. Yes. Q. Were you asleep?
(continued...)

85

Juxtaposed to the above-detailed testimony from Paralegal Crowder and the attorneys for Petitioner's co-defendants stands Petitioner's evidentiary hearing testimony that:

1) he "saw [his trial counsel] sleeping . . . [f]our times at least" (id. at 125; see also id. at 202 ("Q. Today you testified he fell asleep four times; is that correct? A. Yes, ma'am."));

2) "[t]he first time [Petitioner] s[aw his trial counsel] sleeping his head was back and he was snoring aloud in the courtroom" (id. at 124-25; see also id. at 125 (claiming he "hit his [trial counsel's] knee"); but see id. at 125-26 ("Q. . . . That's the first time that you saw him nodding off? A. No, no. . . . Q. . . . When is the first time? A. The first time was when he was nodding back. Q. . . . [I]s that the time you were

---

[47](...continued)
A. No.")), and (B) the view of the law, see United States v. Buckman, Civ. No. 14-540, 2017 WL 3337154, at *5 (E.D. Pa. Aug. 4, 2017) (unpublished) ("Closing one's eyes at times during a trial does not constitute sleeping."), appeal filed, No. 19-1128 (3d Cir. Jan. 15, 2019). Consistent with that understanding, Attorney Johnson testified that, when he thought Petitioner's trial counsel "may have nodded off, . . . [Attorney Johnson] just used [his] foot or [his] knee. [Attorney Johnson] would bump [Petitioner's trial counsel] . . . and he was okay." (Docket Entry 378 at 10; see also id. at 23-24 (setting forth Attorney Johnson's acknowledgment that, during trial, he "may have" closed his eyes, whereupon Petitioner's trial counsel "nudged" Attorney Johnson, and explaining: "[T]rying to stay alert for that length of time over the duration of a couple of weeks, it wears you down. . . . It's 3:00. You haven't eaten and you haven't had your coffee. You're winding down. And I may have gotten fatigued. He may have gotten fatigued, but . . . he nudged me. I nudged him.").) Finally, those incidents did not encompass "lengthy periods during [Petitioner's] trial" (id. at 27), as they lasted only "[a] few seconds" (id.).

just talking about he was snoring?  A.  Yes, snoring loud in the courtroom.  A. . . . And you bumped him?  A.  Yes."));

3) "the next time" Petitioner saw his trial counsel sleeping came a short time later:  "He was coughing for a few minutes and [now-Chief J]udge [Schroeder] asked him 'Are you okay?  I'm going to give a 5 minute recess' or some type of recess.  When he came back from the recess, this time his head was forward."  (Id. at 126; see also id. at 127 ("And I hit him again. . . .  He woke up.  The [C]ourt asked him, 'Are you all right?  Are you all right?' again. . . .  [W]e just had came [sic] back in, I think."));

4) "a few minutes later [Petitioner's trial counsel] just dosed [sic] off for a second and woke right up" (id.; see also id. at 127-28 ("He just dosed [sic] the third time. . . .  [It happened p]robably a minute [after the second instance]."), 129 (agreeing that "[a]ll three of those instances happened on one day")); and

5) Petitioner also reported (without any descriptive detail) other sleep-related events involving his trial counsel "[o]n different days" (id. at 129), with the "next incident" consisting of "another dosing [sic], no sleep" (id. at 130), followed by "[p]robably two more times on dosing [sic] and one time on falling asleep, and that was during the trial" (id.; see also id. at 130-31 ("Q.  What's the difference between dozing and falling asleep?  A.  [Sleeping means h]e was literally out and dosing [sic] he'd just wake right back up.")).

This testimony by Petitioner lacks credibility for a multitude of reasons. First, in setting out the factual support for Ground Seven in the Section 2255 Motion, Petitioner included <u>no</u> allegations about his trial counsel sleeping. (<u>See</u> Docket Entry 254, ¶ 12(Ground Seven) (alleging solely that his trial counsel should have disclosed "trouble remembering things" due to medication).) Second, Petitioner's affidavit (filed along with the Amended Section 2255 Motion and Memorandum of Law) likewise omits <u>any</u> reference to sleeping by his trial counsel. (<u>See</u> Docket Entry 259-1 at 2-4 (discussing only hiring of trial counsel, plea offer, grand jury perjury, and lack of communication about discovery and trial strategy); <u>see also</u> Docket Entry 258, ¶ 12(Ground Seven) (offering no factual allegations).) Third, the 56-page, unsworn/unverified Memorandum of Law contains but two bald assertions that, "[d]uring trial, [Petitioner's trial] counsel was falling asleep during testimony" (Docket Entry 259 at 53) and that he "was falling asleep in trial" (<u>id.</u> at 54). Fourth, after the United States pointed out in its Response that Petitioner's affidavit "did not mention his [trial] counsel falling asleep" (Docket Entry 306 at 31) and that "[t]here [wa]s no evidence that [he] slept through a 'substantial portion' of the trial" (<u>id.</u> at 32 (quoting <u>Ragin</u>, 820 F.3d at 612); <u>see also</u> <u>id.</u> at 31 (noting Paralegal Crowder's "acknowledg[ment] that on one occasion . . . she saw [Petitioner's trial counsel] fall asleep for approximately

88

one minute")), Petitioner did not come forward with an affidavit (or other evidence) to show that his trial counsel slept during trial (much less for a substantial portion thereof); instead, Petitioner merely incorporated into the unsworn/unverified Reply the conclusory "conten[tion] that his [trial] counsel fell asleep on more than one occasion. In fact there were several times, making up a substantial portion of trial, when Petitioner found [his trial] counsel dozing off or sleep [sic], which is ineffective not [sic] matter how it is viewed." (Docket Entry 319 at 10.)

To summarize, the evidentiary hearing represented Petitioner's fourth opportunity on collateral review to address sleeping by his trial counsel, following the filing of (1) the Section 2255 Motion, (2) the Amended Section 2255 Motion, Memorandum of Law, and his affidavit, and (3) the Reply. At each stage, Petitioner's account materially changed from (1) no comment about sleeping, to (2) a generic allegation of sleeping, to (3) a broader-but-still-conclusory assertion of repeated sleeping, to (4) a mix of detailed averments about three sleep-related events on one day and vague remarks about four other incidents on one (or more) other, unspecified day(s). Put plainly, over and over again, Petitioner significantly "change[d] his story . . . [and] the very fact that he made inconsistent statements would tend to undermine his credibility." Latif v. Obama, 677 F.3d 1175, 1206 (D.C. Cir. 2011) (Henderson, J., concurring in the judgment) (internal ellipsis and

quotation marks omitted); see also id. (explaining that "embellish[ing prior statement] with additional details" diminishes credibility "because prior statements that omit details covered at trial are inconsistent if it would have been natural for the witness to include them in the earlier statement" (internal brackets and quotation marks omitted)); Lulonga v. Holder, 410 F. App'x 897, 901 (6th Cir. 2010) (recognizing that "embellishment[ of previous statement] giv[es] rise to a finding that [witness] is not credible"); United States v. Porras-Quintero, No. 07CR228, 2007 WL 4531552, at *8 (S.D.N.Y. Dec. 21, 2007) (unpublished) (observing that "testimonial claims by [witness] were not included in [prior] affidavit" and thus his "credibility was impaired by [his] tendency to embellish his testimony as time went by").[48]

_____

[48] As the Response by the United States notes, Petitioner also bypassed an even earlier, obvious chance to advise the Court about his trial counsel allegedly sleeping in trial. (See Docket Entry 306 at 32 ("[Petitioner] did not make any allegations of his [trial counsel] sleeping when [Petitioner] raised issues regarding [his trial counsel] prior to [the] sentencing hearing . . . ."); see also Docket Entry 119 at 5-6 (setting out Petitioner's complaints about his trial counsel in letter to now-Chief Judge Schroeder dated May 22, 2012, including failure to show Petitioner "discovery, SBI reports, or a warrant or affidavit for the pole cameras," as well as to engage in "trial preparation," to provide pre-trial access to video "interview from the Gwinnett County Sheriff's Department," and to file "any motions to try and have that video excluded from [the] trial," but not alleging that his trial counsel slept through any part of trial); Docket Entry 235 at 2-6 (documenting extended colloquy between Petitioner and now-Chief Judge Schroeder on June 13, 2012, regarding Petitioner's continued representation by his trial counsel, during which Petitioner said nothing about his trial counsel sleeping in trial), 10-20 (same).)

Further undermining Petitioner's credibility, when confronted with his failure to include in his affidavit (in support of his Amended Section 2255 Motion) any allegations about his trial counsel sleeping during trial, rather than giving any plausible explanation for that glaring omission in a straight-forward manner, Petitioner engaged in transparent attempts at evasion and made multiple inconsistent and/or false statements, including by first (correctly) testifying that allegations about his trial counsel sleeping <u>do not</u> appear in the Section 2255 Motion or Amended Section 2255 Motion, then falsely testifying (three times) that such allegations <u>do</u> appear in those filings, as well as falsely testifying that he executed the Memorandum of Law under oath:

Q.  . . . [Y]ou wrote an affidavit, did you not?

A.  Yes, ma'am.

Q.  And . . . that was something that was very important with regard to your case, was it not?

A.  What's that?

Q.  Your affidavit.

A.  Which one?

Q.  The affidavit that you attached to your [Amended Section] 2255 [M]otion.

A.  My rebuttal?  My rebuttal or --

Q.  The affidavit you initially attached to your --

A.  Oh. [Exhibit] A, right?

Q.  That was very important to you wasn't it?

A.   Uh --

The Court:   [Petitioner], was it important or not, your
affidavit that you submitted with your [Amended Section]
2255 [Motion]?

[Petitioner]:   Yes, yes, yes.

Q.   (By [counsel for the United States]) And when you
were writing that affidavit, it was important for you to
put in everything that you needed to tell the Court,
wasn't it?

A.   Everything I could remember, yes.

.  .  .  .

Q.   Let me hand you . . . your affidavit.  Tell me if you
recognize that.

A.   Yes, ma'am.

Q.   And you signed it on the third page . . .; is that
correct?

A.   The third page?  I don't know the number of pages.

Q.   If this is page 1 –

A.   (Inaudible interruption.)

Q.   -- this is page 2 and this is page 3?

A.   (Inaudible interruption.)

Q.   -- did you sign it on page 3?

A.   Yes, ma'am.

.  .  .  .

Q.   . . . I would like you to tell the judge where in
your affidavit you mention [your trial counsel] sleeping.

A.   I didn't mention it in my 2255.  That's my affidavit
as well and I mentioned it in there.

Q.  So you never put it in the affidavit you attached to your [Amended Section] 2255 [Motion]; is that correct?

A.  It's within my 2255.

Q.  My question to you, [Petitioner], is in . . .your affidavit, you never mentioned [your trial counsel] sleeping?

A.  It's within my motion, ma'am.

Q.  . . . [Y]our affidavit, it never mentioned [your trial counsel] sleeping, did it?

A.  In this particular affidavit, no.

Q.  Thank you.

A.  It mentions it in my 2255.

Q.  . . . [I]t [is] mention[ed ] on page 52 of your [M]emorandum [of Law]; isn't that right?

A.  I don't know what page number it is, but it's in there.  I mention it in there.

Q.  And you said he fell --

A.  And it's a sworn [document] --

(Docket Entry 378 at 199-202 (emphasis omitted).)

Other portions of Petitioner's testimony about his trial counsel sleeping similarly suffered from internal inconsistencies or conflicted with the trial transcript.  For example, Petitioner initially testified that "[t]he first time [his trial counsel was] sleeping his head was back and he was snoring aloud in the courtroom" (id. at 124-25), Petitioner then promptly denied "[t]hat's the first time that [he] saw hi[s trial counsel] nodding off" (id. at 125), before quickly reversing course again (see id.

93

at 125-26 ("Q. . . . When is the first time? A. The first time was when he was nodding back. Q. . . . [I]s that the time you were just talking about he was snoring? A. Yes, snoring loud in the courtroom.")). Even worse, the trial transcript belies Petitioner's recounting of the events that followed what he (inconsistently) identified as the first incident, in that:

1) Petitioner placed that incident during the "[e]xpert witness" testimony "about the fingerprint evidence" (id. at 125; see also id. at 197 (affirming belief that trial counsel fell asleep "during Amy Wilde's testimony")) and averred that, in response to trial counsel's snoring, Petitioner "bumped him" and "[Paralegal] Crowder kicked . . . [his] chair from the back" (id. at 126; accord id. at 128), whereupon "[now-Chief Judge Schroeder] asked . . . 'Are you okay? Are you okay?'" (id. at 126);

2) according to Petitioner, the Court then took a recess and, "[w]hen [his trial counsel] came back from the recess, this time his head was forward" (id.; see also id. at 127 (testifying that second sleep-related incident occurred "[a]fter we just had came [sic] back in [from recess]"), 128 ("Q. The second time was right after you came back from a recess? A. Yeah.")), prompting Petitioner to "hit hi[s trial counsel] again" (id. at 127), which, in turn, caused him to "w[a]ke up" (id.; see also id. at 128 ("He woke up out of his sleep and said, 'That was wild.'")), at which

time now-Chief Judge Schroeder "asked him, 'Are you all right?  Are you all right?' _again_" (_id._ at 127 (emphasis added)); and

3) Petitioner testified that "a few minutes later [his trial counsel] just dosed [sic] off for a second and woke right up" (_id._), leading now-Chief Judge Schroeder to "ask[] him was he all right _again_" (_id._ at 129 (emphasis added)).

The trial transcript, by contrast, reflects that:

1) "at 11:01 a.m.," on February 21, 2012, Wilde, "a latent fingerprint examiner" (Docket Entry 202 at 67), appeared and (A) first testified about her job duties, education, training, and experience (_id._ at 67-75), (B) next (after receiving authorization to "give her opinions" (_id._ at 75)) described the process of latent fingerprint identification (_see_ _id._ at 75-90), and (C) then began to catalog the evidence she reviewed in this case (_see_ _id._ at 90-91), when now-Chief Judge Schroeder interrupted the proceeding to ask "Are you okay, [Petitioner's trial counsel]?" (_id._ at 91);

2) a brief, open-court debate about whether to take a short "break" ensued (_id._ at 91-92), during which Petitioner's trial counsel stated that he "certainly d[id]n't want to disturb the Court with this" (_id._ at 92), that he "just swallowed wrong" (_id._), and that he "believe[d he was okay], but [he] might continue to make racket" (_id._), whereupon now-Chief Judge Schroeder elected to "try to keep going" (_id.;_ _see also_ _id._ ("We are going to try to go

forward.")) and Wilde's testimony continued without a recess until the scheduled lunch break at 12:30 p.m. (see id. at 92-117); and

3) at no point in that (post-interruption/pre-lunch recess) segment of Wilde's testimony – which took up half of the 50 transcript pages compiled (and thus, by logical extension, roughly half, i.e., 45 minutes, of the time that passed) from 11:01 a.m. to 12:30 p.m. – did now-Chief Judge Schroeder inquire in open-court about the well-being of Petitioner's trial counsel (see id.).[49]

The foregoing comparison of Petitioner's evidentiary hearing testimony and the trial transcript demonstrates that his account of his trial counsel serially sleeping lacks credibility, because it "is undermined by the record in this case," Diaz, 2014 WL 7384974, at *7. Most notably, Petitioner:

1) seized on the single incident of his trial counsel falling asleep for a minute or less – as candidly related by Paralegal Crowder and corroborated by the trial transcript (compare Docket Entry 202 at 91-92 (documenting one short interruption by now-Chief Judge Schroeder in response to apparent coughing by Petitioner's

---

[49] On one occasion, approximately half-way into that 45-minute period, when Attorney Roberts lodged an objection to a question, now-Chief Judge Schroeder directed the attorneys to "[a]pproach the bench just for a moment" (Docket Entry 202 at 105), whereupon "proceedings were had at the bench by the Court and [c]ounsel out of the hearing of the jury" (id.). Before addressing Attorney Roberts's objection in that bench conference, now-Chief Judge Schroeder asked "Are you feeling better?" (Id.) Petitioner's trial counsel responded: "Yes, thank you. That was wild." (Id.)

trial counsel during Wilde's testimony), <u>with</u> Docket Entry 378 at 38-39 (setting out Paralegal Crowder's testimony regarding that event, along with explanation (A) that pronounced "coughing" by Petitioner's trial counsel represented "his way of playing it off," after she saw his head drop and "immediately kicked the back of his chair," (B) that now-Chief Judge Schroeder asked "'Are you all right?' . . . due to the coughing," and (C) that the trial then "kept moving along")); and

2) fashioned a false narrative of repeated episodes of slumber, built around a phantom recess and fabricated judicial interjections (<u>compare</u> Docket Entry 202 at 91-117 (establishing that, after brief pause during Wilde's testimony due to coughing by Petitioner's trial counsel, trial resumed until normal lunch break, without any intervening recess or open-court entreaties by now-Chief Judge Schroeder about welfare of Petitioner's trial counsel), <u>with</u> Docket Entry 378 at 125-29 (recording Petitioner's testimony that his trial counsel's sleep-related coughing caused recess, after which his trial counsel fell asleep twice more, prompting now-Chief Judge Schroeder to interrupt proceedings each time to inquire about the condition of Petitioner's trial counsel)).[50]

---

[50] The blatancy of Petitioner's attempted deception mirrors his "strong incentive to lie at the hearing . . . . Th[is collateral attack] represents perhaps the only remaining avenue open to [him] to potentially escape service of the extended prison term imposed on him." <u>Diaz</u>, 2014 WL 7384974, at *8.

All of these considerations support but one conclusion, i.e.,
that Petitioner's "testimony [was] not [the] least bit credible.
. . . [His] responses were both evasive and contrived." Ponce-
Duarte, 2011 WL 2791244, at *1; see also Diaz, 2014 WL 7384974, at
*7 (listing, as reasons for rejecting the petitioner's account,
fact that his "testimony conflict[ed] with his prior statements,"
that "his testimony itself was inconsistent," and that "[o]ther
testimony by [him wa]s undermined by the record").     That
determination and the other above-analysis of the record permits
the Court to find only one instance when Petitioner's trial counsel
fell asleep for no more than a minute of testimony by a single
witness (among 43) over the course of multiple weeks of trial.
Given that very short "length of time [he] slept," Ragin, 820 F.3d
at 622 n.11, and the minuscule "proportion of the trial [he]
missed," id., the Court reasonably could not rule that he "slept
for a substantial portion of the trial," id.[51]

---

[51] At oral argument, Petitioner contended his trial counsel
slept "during an important part [of the trial] and the important
part would have been . . . anytime that somebody [wa]s being
questioned . . . ." (Docket Entry 383 at 13.)  Adopting that view
would transform the trigger for a presumption of prejudice from
counsel sleeping "for a substantial portion of the trial," Ragin,
820 F.3d at 622 n.11, to counsel sleeping for any trial testimony.
The Court should decline to distort Ragin's rule in that fashion.
Nor does a review of the testimony presented at the one moment
Petitioner's trial counsel did fall asleep raise a concern about
"the significance of the portion [of the trial he] slept through,"
id.; to the contrary, at that point, Wilde had just begun to
identify evidence submitted for analysis (but had not yet addressed
(continued...)

A final look back at (and comparison of this case to) <u>Ragin</u> reinforces that judgment. In that case, undisputed evidence "demonstrate[d] that [the defendant's] counsel was asleep for much of [the] trial," <u>id.</u> at 613, "a juror . . . testified that she noticed [the defendant's counsel] sleeping 'frequently almost every day morning and evening' for '30 minutes at least' at a time," <u>id.</u> at 615 (internal brackets and ellipses omitted), as well as "that other jurors noticed [him] sleeping and commented on it in the jury room," <u>id.</u>, and "every witness stated that they observed [the defendant's counsel] asleep on at least one occasion, with multiple witnesses testifying that [he] was asleep on multiple occasions," <u>id.</u> at 623 (emphasis omitted). As the preceding discussion shows, <u>no</u> evidence of (or even approaching) that sort appears in this record and thus no presumption of prejudice arises in this case.

In sum, Petitioner cannot prevail on Ground Seven.

<u>Proposed Ground Eight: Ineffective Assistance at Sentencing</u>

Petitioner's Notice (filed with his Supplement Motion) proposes the addition of an eighth claim for "Ineffective Assistance Of Counsel At Sentencing." (Docket Entry 311 at 2.) This proposed claim alleges that "[t]here is no evidence in

---

[51](...continued)
Petitioner's known palm-print) (<u>see</u> Docket Entry 202 at 91), had long since completed her testimony about her qualifications (<u>see</u> <u>id.</u> at 67-75), and only later gave her testimony identifying his known palm-print, as well as confirming its match to a latent palm-print on a piece of drug-related evidence (<u>see</u> <u>id.</u> at 96-97).

[Petitioner's Presentence Report ('PSR')] which indicates the conspiracy continued past November 1, 2010." (Id. at 4.) Nonetheless, according to Petitioner, in completing his PSR, "[t]he Probation Officer used the 2011 SGM [Sentencing Guidelines Manual] to compute the Total Offense Level. The Probation Officer should have used the 2009 SGM." (Id.; see also id. ("As a result of the mistake, Petitioner's Total Offense Level increased +2 Levels for 'pattern of criminal conduct' and a +2 Levels for maintaining a premise for manufacturing or distributing a controlled substance. The 2009 SGM did not include these two enhancements.").) Proposed Ground Eight thus maintains that Petitioner's trial counsel's "performance was objectively deficient for failing to raise th[is] ex post facto issue at sentencing. . . . If [it] had been raised at sentencing, there was a reasonable probability {Petitioner's prison] sentence would have been lower than 440 months." (Id.)

The United States has opposed the addition of this proposed "claim as untimely, because [Petitioner] raised it outside of the one-year statute of limitations." (Docket Entry 377 at 4.) In particular, the United States has argued (with appropriate references to the record and applicable authority) that:

1) because the Fourth Circuit "affirmed [this Court's Judgment against Petitioner] by written opinion on May 21, 2014" (id.) and "Petitioner did not file a petition for writ of certiorari, his conviction became final 90 days later on August 19, 2014" (id.);

2) for any collateral claim, Petitioner "then had one year under [Section] 2255(f)(1) to file" (id.)

3) "Petitioner timely signed his [Section] 2255 [M]otion on August 18, 2015" (id. at 5);

4) under Section 2255(f)(1), proposed Ground Eight, which Petitioner submitted "with the [Supplement] Motion [which he] dated May 14, 2016 . . . was not timely" (id.);

5) "[n]o other provision [of Section 2255(f)(2)-(4) that could] extend [Petitioner's] time [to file proposed Ground Eight] applies" (id. at 4; see also id. at 7 ("Through the exercise of due diligence, [Petitioner] could have timely discovered this issue [and timely raised it] just as [Jeffries] did."));

6) proposed Ground Eight "is new and does not relate back to the claims in the [Section] 2255 [M]otion" (id. at 5); and

7) "[w]here barred by the statute of limitation, an amendment [to a motion under Section 2255 is] futile and, thus, [may be] denied" (id.).

Petitioner did not file a reply. (See Docket Entries dated Nov. 9, 2018, to present.) Nor, at oral argument after the evidentiary hearing, did he contest any of the above-described contentions by the United States as to the untimeliness of proposed Ground Eight; instead, Petitioner's appointed counsel argued:

> [Petitioner] is not knowledgeable in the law. He's
> . . . incarcerated in prison. . . . [H]e ha[d] no
> attorney on [his proposed Ground Eight] and he [wa]s

> trying to come up with the legal argument that would
> follow what happened in his case.
>
> . . . [Petitioner filed his proposed Ground Eight] after
> [] Jeffries [filed a similar claim] . . . . [T]he
> Government has incarcerated [Petitioner] and therefore
> [it] control[s] his ability to get . . . that legal
> information. [Petitioner] ask[s] the Court to consider
> that when considering whether [to] <u>equitably toll</u> the
> time and allow him to make th[e] argument [in proposed
> Ground Eight], just like [Jeffries] was allowed to make
> the argument [in his timely motion under Section 2255].

(Docket Entry 383 at 30-31 (emphasis added); <u>see also</u> Docket Entry

379 at 31 (advising Petitioner's appointed counsel (after

evidentiary hearing) that he "could, in lieu of filing a written

. . . reply [to any response by United States to Supplement

Motion,] . . . address that [response] in [his] oral comments [at

future] . . . schedule[d] argument").)

This Court may equitably toll the federal habeas limitations

period <u>only</u> when a petitioner "shows '(1) that he has been pursuing

his rights diligently, and (2) that some extraordinary circumstance

stood in his way' and prevented timely filing." <u>Holland v.</u>

<u>Florida</u>, 560 U.S. 631, 649 (2010) (quoting <u>Pace v. DiGuglielmo</u>, 544

U.S. 408, 418 (2005)). Petitioner has not made such a showing as

to proposed Ground Eight. <u>See</u> <u>United States v. Sosa</u>, 364 F.3d 507,

512 (4th Cir. 2004) ("[E]ven in the case of an unrepresented

prisoner, ignorance of the law is not a basis for equitable

tolling."); <u>see also</u> <u>San Martin v. McNeil</u>, 633 F.3d 1257, 1268

(11th Cir. 2011) ("Mere conclusory allegations are insufficient to

raise the issue of equitable tolling."); <u>Rouse v. Lee</u>, 339 F.3d
238, 251 (4th Cir. 2003) ("Allowing consideration of the merits of
time-barred claims to creep into the equitable tolling analysis
lets petitioners effectively circumvent the statute of limitations
because the merits of their claims will always be considered.");
<u>Martinez-Fuentez v. United States</u>, No. 1:10CV357, 2013 WL 4778508,
at *2 n.4 (E.D. Tex. Sept. 4, 2013) (unpublished) ("[G]eneralized
statements of alleged limited access to legal materials at the
prison facility are insufficient to raise an issue of a
government-created impediment [under Section 2255(f)(2)].").
Accordingly, the Court should deny the Supplement Motion as futile.

CONCLUSION

None of the seven claims in Petitioner's Section 2255 Motion
and Amended Section 2255 Motion possess any merit. The proposed
eighth claim in Petitioner's Supplement Motion fails as a matter of
law under the statute of limitations.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Section 2255
Motion (Docket Entry 254), Amended Section 2255 Motion (Docket
Entry 258), and Supplement Motion (Docket Entry 310) be denied, all
without issuance of a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 29, 2019